# EXHIBIT I

| From: | ECFnotice@mad.uscourts.gov |
|---|---|
| Sent: | Wednesday, March 28, 2007 3:34 AM |
| To: | CourtCopy@mad.uscourts.gov |
| Subject: | Activity in Case 1:04-cv-11923-DPW ConnectU LLC v. Zuckerberg et al "Order Adopting Report and Recommendations" |
| Follow Up Flag: | Follow up |
| Flag Status: | Orange |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

## United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Woodlock, Douglas entered on 3/28/2007 at 6:34 AM EDT and filed on 3/28/2007

**Case Name:**    ConnectU LLC v. Zuckerberg et al
**Case Number:**    1:04-cv-11923
**Filer:**
**Document Number:**

**Docket Text:**
Judge Douglas P. Woodlock : Electronic ORDER entered ADOPTING REPORT AND RECOMMENDATIONS, the clerk is directed to dismiss this case. Because this dismissal is without prejudice in the sense that it does not address the merits of the allegations, refiling might be contemplated. In this connection, the attention of the parties is directed to Local Rule 40.1(G)which would for the near future cause the refiled case to be treated as a related matter which will be reassigned to this session (and in parallel to Magistrate Judge Collings' session). I would anticipate that under such circumstances case management concerns will result in proceedings effectively picking up where they were left off with this dismissal and previous discovery will be available with a view toward assuring that the case proceeds promptly to resolution. See, e.g., Arrow International v. Spire Biomedical Inc., 443 F.Supp. 2d 182 (D.Mass. 2006)(Woodlock, Douglas)

The following document(s) are associated with this transaction:

**1:04-cv-11923 Notice will be electronically mailed to:**

Steven M. Bauer    sbauer@proskauer.com, bndocketing@proskauer.com

I. Neel Chatterjee    nchatterjee@orrick.com, kmudurian@orrick.com; adalton@orrick.com

Monte Cooper    mcooper@orrick.com

Kenneth W. Curtis   kenneth.curtis@finnegan.com

Margaret A. Esquenet   margaret.esquenet@finnegan.com

Michael P. Giunta   mgiunta@donovanhatem.com

G. Hopkins Guy , III   hopguy@orrick.com

Daniel K. Hampton   dan.hampton@hklaw.com, yvette.cooks@hklaw.com

Robert B. Hawk   Robert.Hawk@hellerehrman.com

John F. Hornick   john.hornick@finnegan.com, pat.hart@finnegan.com;
Geetha.Ananthakrishnan@finnegan.com; jenny.macioge-reilly@finnegan.com

Annette L. Hurst   annette.hurst@hellerehrman.com

Gordon P. Katz   gordon.katz@hklaw.com

Kevin G. Kenneally   kkenneally@dhboston.com

Scott McConchie   sm@gtmllp.com

Robert D. Nagel   rnagel@orrick.com

Jeremy P. Oczek   joczek@proskauer.com, bndocketing@proskauer.com

Bhanu Sadasivan   bhanu.sadasivan@hellerehrman.com

Meredith H. Schoenfeld   meredith.schoenfeld@finnegan.com

Theresa A. Sutton   tsutton@orrick.com, aako-nai@orrick.com

Daniel P. Tighe   dtighe@gtmllp.com

Joshua H. Walker   jwalker@orrick.com

**1:04-cv-11923 Notice will not be electronically mailed to:**

Monte Cooper
,

Donald Daybell
Orrick, Harrington & Sutcliffe LLP
4 Park Plaza Suite 1600
Ervine, CA 92614

G. Hopkins Guy , III
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road

9/19/2007

Menlo Park, CA 94025

Joshua H. Walker
,

# United States District Court
# District of Massachusetts

CONNECTU LLC,
    Plaintiff,

      V.                      CIVIL ACTION NO. 2004-11923-DPW

MARK ZUCKERBERG,
EDUARDO SAVERIN,
DUSTIN MOSKOVITZ,
ANDREW MCCOLLUM,
CHRISTOPHER HUGHES,
THEFACEBOOK, INC.,
    Defendants.

---

MARK ZUCKERBERG,
THEFACEBOOK, INC.,
    Plaintiff-in-Counterclaim,

      V.

CONNECTU LLC,
    Defendant-in-Counterclaim,
CAMERON WINKLEVOSS,
TYLER WINKLEVOSS,
DIVYA NARENDA,
    Additional Defendants-in-Counterclaim.

# REPORT AND RECOMMENDATION ON FACEBOOK DEFENDANTS' MOTION TO DISMISS (#94)

COLLINGS, U.S.M.J.

## I. *Introduction*

To date the Court has issued two Memorandum and Procedural Orders (##172, 230) and held a pair of evidentiary hearings, on June 22, 2006 and October 24, 2006 respectively, on the Facebook Defendants' motion to dismiss (#94). This Report and Recommendation regarding the disposition of that motion to dismiss shall be an amalgam of the two prior memoranda, familiarity with which is assumed and which are incorporated herein by reference[1], as well as such additional analysis and discussion as is necessary to resolve the outstanding issues.

## II. *Background*

### A. *Issues in First Memorandum (#172)*

Defendants Mark Zuckerberg (hereinafter "Zuckerberg"), Eduardo

---

[1] Substantial segments of the earlier memoranda shall be quoted herein verbatim, albeit without quotation marks.

Saverin, Dustin Moskovitz, Andrew McCollum, Christopher Hughes and the Facebook, Inc. (hereinafter collectively the "Defendants") filed the motion to dismiss Plaintiff ConnectU LLC's (hereinafter "ConnectU" or the "Plaintiff") complaint on several grounds, including lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P. Specifically the Defendants contend that in the original complaint, jurisdiction was alleged to be premised solely upon diversity[2] but that, as a matter of fact, diversity did not exist. The motion to dismiss has been referred to the undersigned for the preparation of a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

In 2004, the Supreme Court wrote as follows:

> It has long been the case that "the jurisdiction of the Court depends upon the state of things at the time of the action brought." *Mollan v. Torrance*, 9 Wheat. 537, 539, 6 L.Ed. 154 (1824). This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure. It measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing--whether the challenge be brought shortly after filing, after the trial,

---

[2] Only state law claims were alleged in the original complaint. On September 2, 2004, the date on which the complaint was first filed, ConnectU did not yet have a certificate of registration for its copyright; the certificate of registration was issued later on October 15, 2004. (Exh. to First Amended Complaint #13) As a consequence, there was no basis for federal question jurisdiction on the facts as initially alleged. The complaint was amended as of right on October 28, 2004, to include a claim under federal law, 17 U.S.C. §101 *et seq.*, for copyright infringement.

3

or even for the first time on appeal. (Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment. *See Capron v. Van Noorden*, 2 Cranch 126, 2 L.Ed. 229 (1804).)

We have adhered to the time-of-filing rule regardless of the costs it imposes.

*Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570-571 (2004)(footnote omitted).

ConnectU argues that the question of diversity was rendered moot when the first amended complaint was filed on October 28, 2004, because the alleged basis for jurisdiction in that pleading was the existence of a federal question. According to the Plaintiff, case law and statute allow for any prior inadequacy in diversity jurisdiction to be "cured" by the subsequent amendment.

In support of its position the Plaintiff relies on the case of *Carlton v. Baww, Inc.*, 751 F.2d 781 (5 Cir., 1985). In *Carlton*, the plaintiff, a California resident, brought suit against the defendant, a resident of Texas, seeking "to void a fraudulent conveyance of real property." *Carlton*, 751 F.2d at 783. The court acknowledged that "[d]iversity jurisdiction was therefore properly invoked when this suit was initially filed." *Carlton*, 751 F.2d at 785. While the suit was ongoing, but before trial, the defendant filed for bankruptcy and the automatic stay halted the proceedings. *Carlton*, 751 F.2d at 783. The stay was

4

ultimately lifted and the bankruptcy court allowed the trustee of the defendant's estate to intervene in the original district court action. *Carlton*, 751 F.2d at 783.

When the bankruptcy trustee was joined as a party-plaintiff to the action, diversity was destroyed. *Carlton*, 751 F.2d at 783, 787. However, the bankruptcy trustee was, at that juncture, "the only party who could prosecute" the district court lawsuit. *Carlton*, 751 F.2d at 786. The appeals court recognized that "if ... an amendment to the pleadings alters the nature of the action or adds a party without whom the case cannot continue, jurisdiction must be reassessed at the time of the change." *Carlton*, 751 F.2d at 785 (citations omitted).

On appeal it was argued by the appellees

> that, notwithstanding the failure of the jurisdictional basis asserted in their pleadings, subject matter jurisdiction exists because the trustee was acting pursuant to avoidance powers granted to him by the Bankruptcy Code. We agree. Section 1334 of Title 28, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"), grants the district courts original jurisdiction of, among other things, "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(b) (1984). A proceeding by a trustee to void a fraudulent conveyance clearly "arises under title 11."

*Carlton*, 751 F.2d at 787 (footnote omitted).

Although the Fifth Circuit found that the district court had properly exercised jurisdiction, the complaint had never been "amended to state the new jurisdictional basis that arose when the trustee became a party." *Carlton*, 751 F.2d at 789. To remedy the situation, the Fifth Circuit held that "pursuant to 28 U.S.C. §1653, appellees should be given an opportunity to amend their pleadings to assert the correct jurisdictional basis for this lawsuit." *Carlton*, 751 F.2d at 789.

The primary point to be made with respect to the *Carlton* case is that the district court undeniably had jurisdiction at all times. When the complaint was filed, the district court had diversity jurisdiction. At the time the trustee was added, on the facts as they then existed, even if not expressly alleged, the district court had federal question jurisdiction. The question raised by the Defendants' motion to dismiss in the instant matter is whether this Court, in fact, ever had subject matter jurisdiction based on diversity over the original complaint.

The case of *Blanchard v. Terry & Wright, Inc.*, 331 F.2d 467 (6 Cir.), *cert. denied*, 379 U.S. 831 (1964), another decision cited by the Plaintiff, is readily

distinguishable from the situation at hand. In *Blanchard*, the court concluded

that while there may have been some question as to whether diversity

jurisdiction had been properly pled in the complaint,

> More important than the allegations in the complaint
> concerning diversity of citizenship were the allegations
> that the contract for the construction of the dam and
> spillway was with the United States, and that the bond
> was executed to guarantee the performance of that
> contract and the payment of all bills for labor and
> material furnished in connection therewith. In our
> opinion, these general allegations were sufficient to
> invoke jurisdiction under the Miller Act without the
> necessity of referring to the Act by name.

*Blanchard*, 331 F.2d at 469.

In other words, the court found that the factual allegations of the complaint

supported federal question jurisdiction even though it was not the articulated

basis for jurisdiction. There is no contention that the facts as alleged in the

original complaint in this case would support an alternative basis for

jurisdiction.

ConnectU next points to Title 28 U.S.C. §1653 which provides that

"[d]efective allegations of jurisdiction may be amended, upon terms, in the trial

or appellate courts." Interpreting this statutory provision, the Supreme Court

has written the following:

7

The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed. See, *e.g., Smith v. Sperling*, 354 U.S. 91, 93, n. 1, 77 S.Ct. 1112, 1113, n. 1, 1 L.Ed.2d 1205 (1957). Like most general principles, however, this one is susceptible to exceptions, and the two that are potentially applicable here are reflected in 28 U.S.C. §1653 and Rule 21 of the Federal Rules of Civil Procedure. We discuss each potential exception in turn.

Title 28 U.S.C. §1653, enacted as part of the revision of the Judicial Code in 1948, provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." At first blush, the language of this provision appears to cover the situation here, where the complaint is amended to drop a nondiverse party in order to preserve statutory jurisdiction. But §1653 speaks of amending "*allegations* of jurisdiction," which suggests that it addresses only incorrect statements about jurisdiction that actually exists, and not defects in the jurisdictional facts themselves. Under this reading of the statute, which we believe is correct, §1653 would apply if Bettison were, in fact, domiciled in a State other than Illinois or was, in fact, not a United States citizen, but the complaint did not so allege. It does not apply to the instant situation, where diversity jurisdiction does not, in fact, exist.

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830-831 (1989) (emphasis in original) (superceded in part by statute as stated in *Singh v. Daimler-Benz AG*, 9 F.3d 303 (3 Cir., 1993); *see also Mills v. State of Me.*, 118 F.3d 37, 53 (1 Cir., 1997) ("Specifically, the *Newman-Green* Court refused to interpret section 1653 as 'empower[ing] federal courts to amend a complaint so as to produce jurisdiction where none actually existed before.'").

It is thus quite clear that if there was no diversity jurisdiction at the time the original complaint was filed, Title 28 U.S.C. §1653 cannot somehow be utilized to extend the federal question jurisdiction alleged in the first amended complaint back to the initial filing in order to create jurisdiction where none existed.  On the facts of this case, §1653 is of no aid to ConnectU.[3]

The Plaintiff's argument that "any alleged lack of diversity became moot when ConnectU filed the Amended Complaint" (Response #171 at 2) is not supported by another case upon which it relies, *Wellness Community-National v. Wellness House,* 70 F.3d 46 (7 Cir., 1995).  Jurisdiction in the original complaint in *Wellness Community-National* was supported both by federal question and diversity jurisdiction. *Wellness Community-National,* 70 F.3d at 49. Prior to trial, the plaintiff filed a motion to amend the complaint to drop all of the federal claims and premise jurisdiction solely on diversity.  *Wellness Community-National,* 70 F.3d at 49.  It was in this context that the court wrote:

> In these circumstances, it is well established that the amended pleading supersedes the original pleading. *See Nisbet v. Van Tuyl,* 224 F.2d 66, 71 (7th Cir.1955); *Lubin v. Chicago Title and Trust Co.,* 260 F.2d 411, 413 (7th Cir.1958); *Fry v. UAL Corp.,* 895 F. Supp. 1018

---

[3]

By its terms, Rule 15(c), Fed. R. Civ. P., which provides for the relation back of amendments, does not appertain in the circumstances at hand.

> (N.D.Ill.1995). "Once an amended pleading is interposed, the original pleading no longer performs any function in the case.... [T]he original pleading, once superseded, cannot be utilized to cure defects in the amended pleading, unless the relevant portion is specifically incorporated in the new pleading." 6 C. Wright, A. Miller, & Mary Kay Kane, *Federal Practice and Procedure* §1476 at 556-57, 559 (1990). Thus, our jurisdictional inquiry must proceed on the basis of the First Amended Complaint, not the original one.

*Wellness Community-National*, 70 F.3d at 49.

The *Wellness Community-National* decision does not stand for the proposition that an amended complaint can cure jurisdictional defects in an original complaint so as to avoid dismissal under Rule 12(b)(1).

The Plaintiff has suggested no other exception to the general rule that diversity is determined at the time of the institution of the action that may be applicable, and the Court has found none. Therefore it is the general rule that shall be applied.

The First Circuit recently had occasion to address a question of first impression which bears on the issue at hand:

> The citizenship of an unincorporated entity, such as a partnership, is determined by the citizenship of all of its members. *Carden v. Arkoma Assoc.*, 494 U.S. 185, 195-96, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (limited partnership). Neither the Supreme Court nor

10

> this circuit has yet directly addressed whether that rule also applies to limited liability companies. However, every circuit to consider this issue has held that the citizenship of a limited liability company is determined by the citizenship of all of its members. *See Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir.2004); *GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc.*, 357 F.3d 827, 829 (8th Cir.2004); *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir.2004); *Provident Energy Assocs. of Mont. v. Bullington*, 77 Fed. Appx. 427, 428 (9th Cir.2003); *Homfeld II, L.L.C. v. Comair Holdings, Inc.*, 53 Fed.Appx. 731, 732-33 (6th Cir.2002); *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir.2000); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir.1998); *see also* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Juris.2d § 3630 (Supp.2005). We see no reason to depart from this well-established rule.

*Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54-55 (1 Cir., 2006); *see also JMTR Enterprises, L.L.C. v. Duchin*, 42 F. Supp.2d 87, 93-94 (D. Mass., 1999).

Consequently, although it is alleged that "ConnectU LLC is a limited liability corporation of the State of Delaware" (#1 ¶4), it is the citizenship of the members of ConnectU that must be considered when determining the diversity, or lack thereof, among the parties. The members of ConnectU are Cameron Winklevoss, Tyler Winklevoss, Howard Winklevoss and Divya Narendra

(hereinafter "Narendra").[4] (Declaration of Monte M. F. Cooper (#95), Exh. 6 (#99) at pp. 2, 15, 49)

In the complaint, ConnectU alleged that "[u]pon information and belief, Defendant Mark Zuckerberg is an individual with a place of residence in the State of New York." (#1 ¶5[5])  In the Answer Of All Defendants To First Amended Complaint, Counterclaims Of Mark Zuckerberg And The Facebook, Inc., And Jury Demand (#14), it is stated that "Defendants deny the allegations in Paragraph 5" of the complaint. (#14 ¶5)  In the Counterclaims, it is alleged that "[a]dditional defendant on counterclaim Divya Narendra ("Narendra") is, upon information and belief, a citizen of the State of New York." (#14 ¶6).  In the Counterclaim Defendants' Reply To Counterclaims Of The Facebook, Inc. And Mark Zuckerberg, it is stated that "Counterclaim Defendant Divya Narendra

---

[4]

The issue of the constituent members of ConnectU on the date that the complaint was filed remains to be decided.

[5]

It must be noted that this is an insufficient allegation for jurisdictional purposes in any event since the pertinent inquiry is the citizenship or domicile, not the residency, of a party. *See Lundquist v. Precision Valley Aviation, Inc.,* 946 F.2d 8, 10 (1 Cir., 1991)("[T]he relevant standard is 'citizenship,' i.e., 'domicile,' not mere residence; a party may reside in more than one state but can be domiciled, for diversity purposes, in only one.") The Plaintiff's contention that the present case is distinguishable from *Pramco* on the grounds that diversity was not lacking here because "[n]either the Complaint nor the Amended Complaint alleges that Mr. Zuckerberg was a citizen of ANY state" (#171 at 2, emphasis in original) is patently absurd. That ConnectU has failed to allege the citizenship of Zuckerberg in the original complaint not only equates to a failure properly to allege diversity, it stands as a basis upon which the initial complaint could be dismissed given that the factual basis for the Court's jurisdiction is not apparent from the face of the complaint. *See, e.g., Pramco,* 435 F.3d at 54 ("The jurisdictional facts alleged in the complaint are insufficient to establish the existence of complete diversity.")

admits that he is a resident of the State of New York." (#20 ¶6) Based on these pleadings, it was impossible to determine the citizenship of Narendra or Zuckerberg. Moreover, the parties had proffered no additional admissible evidence for the Court to consider.[6] The upshot was that it simply could not be decided on the then present record whether diversity existed at the time the original complaint was filed. An evidentiary hearing was scheduled for June 22, 2006, with the parties being granted leave to conduct limited discovery in advance of the hearing on the question of the citizenship of Narendra and Zuckerberg at the time that the original complaint was filed.

On June 12, 2006, ConnectU filed a Motion for Leave to File Plaintiff's Supplemental Brief in Opposition to Motion to Dismiss, Presenting New Evidence and Supplemental Authority in View of *Pramco* (#181), together with various declarations and exhibits (##182 and Exh. 1-23, 183, 184, 185, 187, 198).[7] In these filings the Plaintiff advanced the argument, *inter alia*, that

---

[6]

Although certain documents have been appended to the Plaintiff's Surreply To Facebook Defendants' Amended Reply To Plaintiff's Opposition To Facebook Defendants' Motion To Dismiss Plaintiff's Complaint, those documents have not been authenticated by means of an affidavit. Further, although the Defendants have offered argument on the question of Zuckerberg's citizenship at the time the complaint was filed (*see*, e.g., #111 at 3 n. 2), it is just that, argument, not evidence.

[7]

No motion was filed, nor any request made, to expand the scope of the scheduled evidentiary hearing.

diversity existed on September 2, 2004 when the complaint was filed because at that time Narendra was not a member of ConnectU. Eight days later on June 20, 2006, the Defendants filed a Motion to Strike Plaintiff's Supplemental Declarations of Divya Narendra, Tyler and Cameron Winklevoss in Support of Plaintiff's Supplemental Brief (#191), a Memorandum in Opposition to the Motion for Leave to File Plaintiff's Supplemental Brief (#192), as well as affidavits and exhibits (##193 and Exh. 1, #194 and Exh. A-Q, 197). On July 7, 2005, ConnectU filed an Opposition to Facebook Defendant's (sic) Motion to Strike (#201) along with a declaration and exhibits (#202 and Exh. 1-4).

The evidentiary hearing was held as scheduled on June 22, 2006. During the course of the hearing the parties stipulated to the fact that Narendra was a citizen of the state of New York. (#219 at 12)  Consequently, the bulk of the hearing was devoted to the citizenship of Zuckerberg.  At the conclusion of the hearing after the question of Zuckerberg's citizenship was taken under advisement, the Plaintiff made an offer of proof regarding Narendra's membership in ConnectU on the date the complaint was filed. (#221 at I-224 to I-226)  The Defendants responded by arguing first that, as a result of the integration clause in ConnectU's operating agreement, the parol evidence rule barred consideration of any oral agreement among Narendra, Tyler Winklevoss

14

and Cameron Winklevoss; second, that Narendra is judicially estopped from claiming that he is not a member of ConnectU in light of his previous sworn testimony; and third, that because ConnectU was not registered to do business in Massachusetts it cannot maintain an action in the Commonwealth and, further, because the limited liability company no longer exists since it was merged into ConnectU, Inc., the failure to register cannot be cured. (#221 at I-226 to I-234)  A briefing schedule on these three issues was set. (#221 at I-234 to I-235)

On July 13, 2006, the Plaintiff filed a memorandum of law (#212) on the trio of legal issues raised at the evidentiary hearing together with a declaration and exhibits. (#213 and Exh. 1-9[8])  The Defendants submitted their objection to the Plaintiff's memorandum (#225) and a declaration with exhibits (#226 and Exh. A -Y) on July 27, 2006.  At that juncture, the record on the issue of the citizenship of Narendra and Zuckerberg was complete.

## B. Issues In The Second Memorandum (#230)

After considering all of the evidence presented, the Court found that

---

[8]

On July 25, 2006, a further declaration and exhibit (#222) was submitted in support of the memorandum of law filed on July 13th, basically confirming the fact that ConnectU, Inc. had filed the Foreign Corporation Certificate of Registration with the Commonwealth of Massachusetts, although it had yet to be approved.

Zuckerberg was a citizen of the state of New York on September 2, 2004. Having reached that conclusion, the three legal issues raised at the end of the evidentiary hearing became relevant because if Narendra was a member of ConnectU on the date this lawsuit was filed, there was no diversity of citizenship and the action must be dismissed. In the Second Memorandum and Procedural Order (#230), the Court ruled on the first two of those issues and pretermitted the third.

### i. Parol Evidence Rule

The Defendants take the position that pursuant to the terms of ConnectU's Operating Agreement which was signed on August 5, 2005, Narendra was a member of ConnectU effective April 6, 2004. Since the Operating Agreement is a fully integrated contract, the argument runs that the parol evidence rule forecloses ConnectU from offering evidence of any prior oral agreements to alter the terms of the written agreement.

The issue to be decided is whether Narendra was a member of ConnectU on September 2, 2004, the date the complaint was filed. When considering this question, the "time-of-filing rule" controls, not the language of a later executed

contract.[9] In other words, the subsequent action of the parties cannot alter the state of the facts as they actually existed on the pertinent date. The bottom line is that the parol evidence rule does not apply in the circumstances at hand. Based on the evidence proffered by the parties in their various filings, there undeniably was a dispute of fact as to whether Narendra was a member of ConnectU on September 2, 2004.

### ii. *Judicial Estoppel*

The Defendants contend that the Plaintiff is estopped from now claiming that Narendra was not a member of ConnectU on September 2, 2004. The circumstances in which the doctrine of judicial estoppel will be applied have been detailed at some length:

> In order for judicial estoppel to be applicable, it is "widely recognized" that "at a minimum, two conditions must be satisfied." *Synopsys*, 374 F.3d at 33. Initially, the previously asserted position or estopping position, and the presently asserted position or estopped position, must be "mutually exclusive" and "clearly inconsistent." *Synopsys*, 374 F.3d at 33; *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Second, the party to be estopped, in this instance the United States, must "have

---

[9] This is not to suggest that the terms of the Operating Agreement may not be relevant in determining whether Divya Narendra was a member of ConnectU on September 2, 2004. It is only to say that the terms of the Operating Agreement are not *determinative* of the issue.

succeeded in persuading a court to accept its prior position." *Synopsys*, 374 F.3d at 33 (*citing Lydon v. Boston Sand & Gravel, Co.*, 175 F.3d 6, 13 (1 Cir., 1999)); *Gens v. RTC*, 112 F.3d 569, 572 (1 Cir.), *cert. denied*, 522 U.S. 931, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997). Together these two conditions give the impression that either the "first court has been misled or the second court will be misled, thus raising the specter of inconsistent determinations and endangering the integrity of the judicial process." *Synopsys*, 374 F.3d at 33 (*citing New Hampshire*, 532 U.S. at 750-51, 121 S.Ct. 1808).

Another consideration weighed by courts, albeit "not a formal element of a claim of judicial estoppel," is whether the party asserting the alleged inconsistent position would gain an unfair advantage. *Synopsys*, 374 F.3d at 33. This element, however, is not a "sine qua non to the applicability of judicial estoppel" for it is the court's acceptance of the argument, "not the benefit flowing from the acceptance, that primarily implicates judicial integrity." *Synopsys*, 374 F.3d at 33.

In sum, it can generally be stated that in the situation where "'a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage'" the doctrine of judicial estoppel may be invoked. *Synopsys*, 374 F.3d at 33 (*quoting InterGen v. Grina*, 344 F.3d 134, 144 (1 Cir., 2003)).

*Fieldwork Boston, Inc. v. U.S.*, 344 F. Supp.2d 257, 267 (D. Mass., 2004).

To support their position, the Defendants point to the following evidence.

In the first amended complaint, Narendra is described as a founder of

ConnectU who began to develop a business plan for a new website in December, 2002. (#13 ¶¶11, 12) The founders wanted to launch this new website before they graduated from Harvard in June of 2004. (#13 ¶13)

In August, 2005, TheFacebook, Inc. filed suit in the state court of California against ConnectU LLC, Cameron Winklevoss, Tyler Winklevoss, Howard Winklevoss, Divya Narendra, and Does 1-25 alleging violation of California Penal Code §502(c) and common law misappropriation/unfair competition. (#226, Exh. A)  In response, the individual defendants filed a motion to quash service of complaint and summons for lack of personal jurisdiction. (#226, Exh. B[10]) In that motion it was argued that the "Individual Defendants have no contact with California" (#226, Exh. A at 2) and "[i]n addition, the only connection the Individual Defendants have to the alleged acts in this case is as members of Defendant ConnectU LLC." (#226, Exh. A at 2-3)

The parties undertook discovery on the question of personal jurisdiction. (#226 ¶5)  As part of the process, TheFacebook, Inc. propounded a set of special interrogatories to the individual defendants, including interrogatory no. 14. (#226, Exh. D)  The interrogatory is as follows:

---

[10]

Defendant ConnectU did not contest that the California court had personal jurisdiction over it. (#226, Exh. B at 6)

### INTERROGATORY NO. 14:

IDENTIFY current AND former directors, officers, employees, AND agents of CONNECTU (including without limitation, Members, Managers, AND Board of Managers as defined in the Limited Liability Company Operating Agreement of ConnectU, LLC - bates numbers C011285 through 011335), HARVARDCONNECTION, AND WINKLEVOSS COMPANIES, including without limitation, dates in these positions, duties, job descriptions, authorities, AND responsibilities.

#226, Exh. D.

The individual defendants initially responded by objecting and proffering no substantive answers. (#226, Exh. E)  TheFacebook, Inc. then filed a motion to compel supplemental responses (#226, Exh. F) which was allowed.  Thereafter, the response to Interrogatory 14 was supplemented to include the following:

Members of ConnectU include Cameron Winklevoss, Tyler Winklevoss, Howard Winklevoss, and Divya Narendra, as set forth in the Limited Liability Company Operating Agreement recited in the Interrogatory ("Operating Agreement") and found at bates numbers C011285 through C011335.  These persons have all been Members since ConnectU was formed.

#226, Exh. H.

TheFacebook, Inc. also filed certain form interrogatories (#226, Exh. L) to which the Court also compelled answers. (#226, Exh. G)    In the

supplemental responses and declarations it was represented that "[s]ubstantially most if not all of these downloads [from the facebook.com] occurred prior to the end of July, 2004" (#226, Exh. P) and that the actions were taken "on behalf of ConnectU." (#226, Exh. M)

In a declaration filed on June 12, 2006 in the present case, Narendra stated, *inter alia*, that

> 1. On and prior to September 2, 2004, the oral agreement between the Harvard Connection founders, Tyler and Cameron Winklevoss, and I, was that only Cameron and Tyler were Members of ConnectU LLC.
>
> *****
>
> 3. Because our respective roles, contributions, and shares in the company were uncertain, I was not made a Member of ConnectU LLC until well after September 2, 2004.

Declaration of Divya Narendra #184.

Narendra was questioned at his June 16, 2006 deposition about the inconsistency between his interrogatory answers in the California case and the recently filed declaration in the present case:

> Q. Responding to 14 you say the members of ConnectU include Cameron Winklevoss, Tyler Winklevoss, Howard Winklevoss and Divya Narendra, correct?

A.    Correct.

Q.    And then you say those persons have all been members since ConnectU was formed?

A.    That's what it says, yes.    Can I just clarify something, though?

\*\*\*\*\*

Q.    When you signed your interrogatory response, amended interrogatory response on March 9th, 2006 under penalty of perjury, did you consider your answer to be accurate?

A.    Yes.

Q.    And when you say they had, these persons have all been members since ConnectU was formed, do you agree that conflicts with your statement that only Cameron and Tyler were members of ConnectU LLC prior to September 2nd, 2004 in your declaration?

A.    I think this actually may be misstated.  What I'm referring to here is the operating agreement.  That –

> MS. ESQUENET: Let the record reflect that by "here" the witness is referring to the response to interrogatory number 14.

A.    Right, so in interrogatory response number 14 when I say, or when it says that these persons have all been members since ConnectU was formed, I'm referring to the date as of this Limited Liability Company Operating Agreement in the sentence before.

Q.    You agree you don't say that in the interrogatory response?

\*\*\*\*\*

> A.   I didn't say that.   I see how that could be
> misconstrued, but that's what I'm referring to is this
> operating agreement.

#213, Exh. 7.

In their brief in support of their motion to quash, the individual

defendants argued that:

> [T]his Court lacks jurisdiction over the Individual
> Defendants because (a) they have few if any contacts
> with the forum, (b) they have not availed themselves
> of the benefit of the forum in any way, purposefully or
> otherwise, and (c) the Plaintiff's claims do not arise out
> of any personal contacts between the Individual
> Defendants and the forum (nor can Plaintiff plead
> otherwise).

#226, Exh. B at 4.

They further asserted that "[t]o the extent the Individual Defendants have any

contacts with California, it is as a result of their being members of ConnectU

LLC" and "[t]he Individual Defendants did not take any acts regarding Plaintiff

outside their positions as members of an LLC, and Plaintiff has no evidence that

they did." (#226, Exh. B at 6)  On June 1, 2006, the individual defendants'

motion to quash was allowed with the Court writing "The Motion of Defendants

CAMERON WINKLEVOSS, TYLER WINKLEVOSS, HOWARD WINKLEVOSS, and

DIVYA NARENDRA to Quash Service of Complaint and Summons for Lack of

Personal Jurisdiction is granted." (#226, Exh. C)

Because Cameron Winklevoss, Tyler Winklevoss, Howard Winklevoss, and Narendra argued in the alternative in support of their motion to quash, i.e., basically that they had little or no contact with the forum or, if they did, it was only in a representative capacity on behalf of ConnectU, and the California judge provided no reasoning for his decision, it is impossible to say that the conditions for application of the doctrine of judicial estoppel have been met. For example, if the judge found that Narendra individually had had insufficient contact with California to support personal jurisdiction there, that finding would not necessarily be inconsistent with finding that Narendra was not a member of ConnectU on September 2, 2004. Moreover, it remains unknown upon which ground the Court relied in making the ruling. The Defendants' protestations notwithstanding, it cannot be assumed that the judge concluded that although Narendra had sufficient contacts with California, those contacts were only on behalf of ConnectU so jurisdiction could not be exercised over Narendra personally.

Further, in light of Narendra's deposition testimony explaining the seeming inconsistency between the interrogatory answers and his declaration, it could not be stated that the testimony was completely contradictory. What

it really came down to at that point was a question of credibility, and that was best addressed in the context of an evidentiary hearing. Just such a hearing was scheduled for September 26, 2006, and then reset to October 24, 2006, at the parties' request.[11]

### III. *Discussion*

As is becoming all too familiar in this case, the October 24th evidentiary hearing raised even more questions that needed to be resolved in order make an informed recommendation regarding the disposition of the motion to dismiss. The Court requested that the parties brief two questions of law without reference or citation to the evidence:

> 1.    Does Delaware law control for purposes of deciding whether Narendra was a member of ConnectU LLC with respect to federal diversity?
>
> 2.    As a matter of Delaware law, is  Narendra deemed a member of ConnectU LLC as of September 2, 2004 because of the retroactivity provision of the later executed Operating Agreement?

#263 at II-107 - II-114[12].

---

[11]

At that juncture the Court pretermitted the registration issue.

[12]

The Court had not intended to limit the parties' briefing on the extant issues; these two questions were meant to serve only as examples of what the parties were to address.

The parties appear to agree on the answer to the threshold inquiry:  It is the state law of Delaware that is applied to determine the constituent members of the limited liability company, ConnectU LLC, on the date the complaint in this case was filed, September 2, 2004, in order to determine whether diversity existed. *See*, #255 at 4 ("To apply the rule properly, the Court must step back in time to September 2, 2004 and apply the Delaware law for determining membership."); #266 at 4 ("The law is well-settled that courts must look to the law of the state where a fictitious entity was established to determine membership/partnership for purposes of diversity jurisdiction.); #265 at 2 ("Because an LLC is an artificial entity created by state law, its status and characteristics, including its membership on a particular date, can only be defined by the law of the state which created the LLC."). The thornier issue upon which the parties disagree is whether a provision of Delaware law that permits retroactivity can affect whether federal diversity jurisdiction existed at the time of the filing of the complaint.

Initially, a basic principle warrants repetition, to wit, the rule that diversity is determined at the time of the filing of the complaint. *Grupo*, 541

U.S. at 570-571.[13]  If diversity is found to have existed at the time of filing,

"such jurisdiction may not be divested by subsequent events."

*Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991)(citations

omitted).  Conversely,

> A corollary of the general rule that diversity is
> determined as of commencement is that if diversity of
> citizenship did not exist when the action was
> commenced, it cannot be created by a later change of
> domicile or some other event.  This rule seems sound
> and consistent with the brightline policy of determining
> diversity as of the date of commencement of the action.

Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction 2d §3608
at 458-459  (footnotes omitted).

Exceptions to the general rule are extremely limited as, for example, the

---

[13]

As explained in a leading treatise:

> The general rule that if jurisdictional prerequisites are satisfied
> when the suit is begun, subsequent events will not work an ouster of
> jurisdiction***is not attributable to any specific statute or to any language
> in the statutes which confer jurisdiction.  Rather, it represents a policy
> decision that the sufficiency of jurisdiction should be determined once and
> for all at the threshold and if found to be present then should continue
> until final disposition of the action. This approach provides maximum
> stability and certainty to the viability of the action and minimizes repeated
> challenges to the court's subject matter jurisdiction.

> Moreover, determining whether diversity exists at the
> commencement of the action offers a uniform test that is relatively easy to
> apply.

Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction 2d §3608 at 452 (footnotes, internal
quotations and citation omitted).

ability of a court to dismiss a nondiverse, dispensable party in order to cure a

jurisdictional defect. *See, e.g., Grupo*, 541 U.S. at 572; *Newman-Green*, 490 U.S.

at 832. Indeed, the Supreme Court recently wrote that:

> To our knowledge, the Court has never approved a deviation from the rule articulated by Chief Justice Marshall in 1829 that "[w]here there is *no* change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit." *Conolly* [v. Taylor], 2 Pet. [556] at 556 [(1829)], 7 L.Ed. 518 (emphasis added). Unless the Court is to manufacture a brand-new exception to the time-of-filing rule, dismissal for lack of subject-matter jurisdiction is the only option available in this case. The purported cure arose not from a change in the parties to the action, but from a change in the citizenship of a continuing party. Withdrawal of the Mexican partners from Atlas did not change the fact that Atlas, the single artificial entity created under Texas law, remained a party to the action. True, the composition of the partnership, and consequently its citizenship, changed. But allowing a citizenship change to cure the jurisdictional defect that existed at the time of filing would contravene the principle articulated by Chief Justice Marshall in Conolly. [FN5] We decline to do today what the Court has refused to do for the past 175 years.
>
> FN5. The dissent acknowledges that "[t]he Court has long applied [Chief Justice] Marshall's time-of-filing rule categorically to post-filing changes that otherwise would destroy diversity jurisdiction," *post*, at 1931, but asserts that "[i]n contrast, the Court has not adhered to a similarly steady rule for post-filing changes in the

> party line-up, alterations that *perfect* previously
> defective statutory subject-matter jurisdiction," *post,* at
> 1931. The authorities relied upon by the dissent do not
> call into question the particular aspect of the
> time-of-filing rule that is at issue in this case--the
> principle (quoted in text) that "[w]here there is no
> change of party, a jurisdiction depending on the
> condition of the party is governed by that condition, as
> it was at the commencement of the suit." *Conolly*, 2
> Pet., at 556, 7 L.Ed. 518 (emphasis added). The dissent
> identifies five cases in which the Court permitted a
> postfiling change to cure a jurisdictional defect. *Post,* at
> 1931-1932. Every one of them involved a *change of
> party*. The dissent does not identify a single case in
> which the Court held that a single party's postfiling
> change of citizenship cured a previously existing
> jurisdictional defect.

*Grupo*, 541 U.S. at 574-575.

The Plaintiff argues that in undertaking the diversity analysis, the time-of-filing rule means that the facts as they existed on the date that the action was commenced must be examined in light of applicable state law, in this instance, Delaware law.  This is a correct articulation of the law.

The Defendants, on the other hand, contend that the existence of diversity is determined by looking to Delaware law, and under Delaware law:

> (d) A limited liability company agreement may be
> entered into either before, after or at the time of the
> filing of a certificate of formation and, whether entered
> into before, after or at the time of such filing, *may be*

>    *made effective as of the formation of the limited*
>    *liability company or at such other time or date as*
>    *provided in the limited liability company agreement.*

6 Del. Code Ann. §18-201(d)(emphasis added).

The LLC Operating Agreement in the instant case, although executed in August, 2005, provided that Narendra was a founding member as of the date of ConnectU's formation, i.e., April 6, 2004. Thus, according to the Defendants, because Delaware law would enforce the retroactive provision in the LLC Operating Agreement, Narendra must be deemed to have been a member on the date the complaint was filed in September, 2004.

The Defendants' position is contrary to the decision in *Grupo* that absent a later change in party (and ConnectU as the plaintiff entity has not changed), a subsequent alteration in the membership of the party entity does not impact whether diversity existed on the date of filing. Moreover, the cases upon which they rely do not aid their cause. For example, in *Carbine v. Xalapa Farm Limited Partnership*, 980 F. Supp. 860 (E.D. La., 1997), while it is true that the court turned to an examination of state law and the terms of the partnership agreement in order to determine whether the plaintiff was a limited partner and, consequently, whether diversity jurisdiction existed, there was no issue

with respect to retroactivity since all of the relevant events pre-dated the filing of the complaint.[14] *Carbine*, 980 F. Supp. at 863.

In *Kier Brothers Investments Inc. v. White*, 943 F. Supp. 1 (D.D.C., 1996), the defendants, both of whom were residents of Maryland, contested diversity claiming "that at the time the complaint was filed, the plaintiff [North Carolina] limited partnership was a citizen of Maryland because one of its limited partners...was a Maryland citizen." *Kier,* 943 F. Supp. at 2. In response the plaintiff asserted that the limited partner in question, one Alfred Bernstein, had transferred by assignment his interest in the limited partnership more than one year prior to the filing of the complaint and so was no longer a limited partner. *Kier,* 943 F. Supp. at 2. To decide whether Bernstein was a limited partner at the time the complaint was filed, the court analyzed the effect of an assignment of a limited partnership interest under the applicable state law and the provisions of the limited partnership agreement. *Kier,* 943 F. Supp. at 3-4. Once again, there was no issue of retroactivity; the focus was on the facts as they existed on the date that the action was commenced. *Kier,* 943 F. Supp. at 4 ("For purposes of diversity, plaintiff is considered a citizen of Maryland because

---

[14]

The Xalapa Farm Limited Partnership was formed on December 28, 1995, certain assignments were made on May 17, 1996 and the complaint was filed on July 17, 1997. *Carbine*, 980 F. Supp. at 861.

one of its limited partners, Mr. Bernstein, was a citizen of Maryland *at the time*

*the complaint was filed in this action on May 3, 1993*." (emphasis added)).

The issue in *Schiavone Construction Co. v. City of New York*, 99 F.3d 546

(2 Cir., 1996) was

> whether a company's legitimate assignment of its interest in a joint venture construction project eliminates that company's citizenship from consideration in determining whether diversity jurisdiction exists in a later suit by the joint venture for sums allegedly owed for work on the project.

*Schiavone*, 99 F.3d at 547.

To resolve the question of whether Daidone Electric of New York ("Daidone"),

an entity incorporated in New York with a principal place of business in New

York, was a member of the joint venture when the complaint was filed even

though it had earlier assigned its interest in the joint venture to Schiavone, the

Second Circuit turned to New York state law. *Schiavone*, 99 F.3d at 548.

Because New York law recognizes choice of law provisions in contracts and the

parties had agreed in their joint venture agreement that New Jersey law would

control, New Jersey law was found to be applicable to the issue. *Schiavone*, 99

F.3d at 548.  Under the state law of New Jersey, the joint venture "continue[d]

to exist with respect to *all* pre-existing matters until they have been wound up."

*Schiavone*, 99 F.3d at 549.  Because the law suit at issue was to collect a debt owed to the joint venture, without doubt it was related to a "pre-existing matter." *Schiavone*, 99 F.3d at 549-550.  Consequently Daidone was deemed to be a member of the joint venture thereby defeating diversity jurisdiction. *Schiavone*, 99 F.3d at 550.  Again, while state law and the provisions of the joint venture agreement were considered by the court, there was no issue of retroactivity; the focus was solely on the law applicable to the facts as they existed on the date the action was commenced.

The Defendants place primary emphasis on the case of *611, LLC v. U.S. Lubes, LLC*, 2006 WL 2038615 (D. Md., Jul. 18, 2006) as being persuasive authority in support of their position.  The case presented on a motion to remand with the plaintiffs 611 LLC ("611") and American First Management, Inc. ("American First") arguing that the action had been improperly removed from state court because complete diversity among the parties was lacking. *611, LLC*, 2006 WL 2038615, *1.  Both plaintiffs were citizens of Maryland. *611, LLC*, 2006 WL 2038615, *1.  The question to be decided was whether either plaintiff was a member of the defendant limited liability company, U.S. Lubes, LLC ("U.S. Lubes") "for diversity purposes." *611, LLC*, 2006 WL 2038615, *1.

33

Because U.S. Lubes was a Delaware limited liability company, its membership was to be determined according to the terms of its Operating Agreement and Delaware law. *611, LLC*, 2006 WL 2038615,*2. In analyzing the issue, the court examined what effect the conveyance by American First of its interest in U.S. Lubes to 611 had under the terms of the U.S. Lubes Operating Agreement. *611, LLC*, 2006 WL 2038615,**2-4. If, as a result of the conveyance, 611 was an Assignee, it would not have been a member of the LLC and its citizenship would not be considered in deciding diversity. *611, LLC*, 2006 WL 2038615,**2-4. If, however, 611 had become a Substitute Member consequent to the conveyance, its citizenship would be relevant. *611, LLC*, 2006 WL 2038615,**2-4. Finding the terms of the Operating Agreement to be ambiguous, the court considered other factual evidence that bore on the question of 611's status, i.e., the manner in which U.S. Lubes treated 611. *611, LLC*, 2006 WL 2038615,**2-5. The upshot was the court's conclusion that

> In light of the Agreement's ambiguities and the parties' conduct, the plaintiffs had reasonable grounds for believing then, and claiming now, that 611 satisfied the requirements for becoming a Substitute Member of U.S. Lubes.

*611, LLC*, 2006 WL 2038615,*6.

Because 611 was both the plaintiff and a member of the defendant LLC such that its citizenship was to be considered for diversity purposes, the motion to remand was allowed for lack of jurisdiction. *611, LLC*, 2006 WL 2038615,*6.

As in the other cases cited by the Defendants, while the court certainly considered the terms of the Operating Agreement in deciding who constituted the members of the LLC in the *661, LLC* case, again no issue of retroactivity was raised in the diversity analysis. In fact, defendant Saverin concedes that "no court has addressed the precise issue of whether a retroactive LLC operating agreement given effect under state law is determinative for purposes of establishing members of the LLC at the time of filing." (#265 at 12[15]) None of

---

[15]

Defendant Saverin further states that "courts consistently have relied upon state legal principles, including retroactivity, in determining the status of a business entity at the time of filing" citing *Wild v. Subscriptions Plus, Inc.*, 292 F.3d 526 (7 Cir.), *cert. denied*, 537 U.S. 1045 (2002) and *Costain Coal Holdings, Inc. v. Resource Investment Corp.*, 15 F.3d 733 (7 Cir., 1994). These two cases are readily distinguishable from the case at bar.

In *Wild*, "the corporate charter of one of the defendants had been revoked before [the] case was brought" and, although later reinstated, on the date the complaint was filed the corporation had no corporate charter. *Wild*, 292 F.3d at 528. The Seventh Circuit wrote:

> An approach consistent with the general principle, but which leads to the same result in this case as the approach in *Costain* would, makes the question of what state a corporation is a citizen of if its corporate charter has been revoked depend on the status of such an entity under the law of the state that granted (and later revoked) the charter. Most states sensibly permit a corporation whose charter has been revoked to continue nevertheless to operate as a corporation, specifically for purposes of suing and being sued, until it is actually dissolved.... Oklahoma, the state of incorporation of the defendant in question (Subscription Plus), is one of those states. And, for icing on the cake, Oklahoma also has a statute making reinstatement of a corporation's charter retroactive. We conclude that the revocation of Subscription Plus's corporate charter did not affect its status for diversity purposes.

the cases upon which the Defendants rely persuade the Court that the retroactivity provision in Delaware LLC law trumps the long-standing federal policy.

To apply the retroactive provision in the ConnectU LLC Operating Agreement, a provision admittedly enforceable under Delaware law, would be to permit a subsequent event to dictate diversity. This is not the rule, nor is it a recognized exception to the rule. Indeed, following the Defendants' reasoning, if the diversity issue had been completely adjudicated prior to August 5, 2005, the date that the Operating Agreement was executed, the decision as to whether Narendra was a member of the LLC on the date that the complaint was filed (and thus whether diversity existed on September 2, 2004) potentially could have been different than when the decision is being made post August 5, 2005. Accepting the Defendants' argument would foster precisely the type of litigation and uncertainty that the time-of-filing rule seeks to avoid. *See Grupo*,

---

*Wild*, 292 F.3d at 528-529 (internal citations omitted).

Thus, the *Wild* court principally relied on the Oklahoma state statute allowing for a corporation to sue and be sued despite having a revoked corporate charter in order to determine the defendant's status; the Oklahoma state statute for permitting retroactive reinstatement of a corporate charter was merely "icing on the cake."

In *Costain*, the Seventh Circuit concluded that an intervenor was an indispensable party at the time the complaint was filed such that its citizenship had to be considered retroactively in order to determine diversity jurisdiction. *Costain*, 15 F.3d at 735. These factual circumstances are entirely distinct from the case at hand.

541 U.S. at 582 ("We decline to endorse a new exception to a time-of-filing rule that has a pedigree of almost two centuries. Uncertainty regarding the question of jurisdiction is particularly undesirable, and collateral litigation on the point particularly wasteful. The stability provided by our time-tested rule weighs heavily against the approval of any new deviation.")  In sum, to decide the diversity question, the Court must look at the September 2, 2004 snapshot and, based on the facts as they existed that day, determine under Delaware law who were then the constituent members of ConnectU LLC.

The issue as thus limned places this case in a somewhat unique posture. Under Delaware law, the retroactive provision of the Operating Agreement executed after the complaint in this case was filed would be recognized and enforced such that Narendra, along with Cameron, Tyler and Howard Winklevoss, would be deemed to have been members of ConnectU as of April 6, 2004.  In the context of the diversity analysis, however, this retroactive provision does not carry the day.   Rather, the provisions of the Delaware Limited Liability Company Act must be examined in order to determine which individual(s), if any, were members of ConnectU on September 2, 2004.

Starting with the basics, Delaware law provides that

(11) "Member" means a person who has been admitted

37

> to a limited liability company as a member as provided
> in §18-301 of this title or, in the case of a foreign
> limited liability company, in accordance with the laws
> of the state or foreign country or other foreign
> jurisdiction under which the foreign limited liability
> company is organized.

6 Del. Code Ann. §18-101(11).

The referenced section, 6 Del. Code Ann. §18-301, distinguishes between the admission of members before or at the time of the formation of a limited liability company and the admission of members after the limited liability company has been formed. Each subsection shall be addressed in turn.

First,

> (a) In connection with the formation of a limited
> liability company, a person is admitted as a member of
> the limited liability company upon the later to occur of:
>
> (1) The formation of the limited liability company; or
>
> (2) The time provided in and upon compliance with
> the limited liability company agreement or, if the
> limited liability company agreement does not so
> provide, when the person's admission is reflected in the
> records of the limited liability company.

6 Del. Code Ann. §18-301(a).

With respect to subsection (a), the documentary evidence makes clear, and the parties do not appear to dispute, that no one became a member at the formation

38

of the LLC.  The Certificate of Formation for ConnectU[16] sets forth only the name of the LLC together with the address of its registered office in Delaware and the name of its registered agent at that address, to wit, The Company Corporation[17].  This is perfectly acceptable under Delaware law and does not in any manner implicate the validity of the LLC.[18]  *See* 6 Del. Code Ann. §18-102(2) ("The name of each limited liability company as set forth in its certificate of formation:...[and] (2) *May* contain the name of a member or manager." (emphasis added); *see also* 6 Del. Code Ann. §18-201(a)[19]; *In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *3 (Del.Ch., Mar. 10, 2006)).

---

[16]

This document is Exhibit 1 in the Plaintiff's exhibits from the October 24, 2006 hearing.

[17]

The Company Corporation was a company that Tyler Winklevoss found online that engaged in the business of setting up LLCs. (#261 at 19)

[18]

"The certificate of formation is a relatively brief and formal document that is the first statutory step in creating the LLC as a separate legal entity.  The certificate does not contain a comprehensive agreement among the parties, and the statute contemplates that the certificate of formation is to be complemented by the terms of the Agreement." *Elf Atochem North America, Inc. v. Jaffari,* 727 A.2d 286, 288 (Del., 1999) (footnotes omitted).

[19]

(a) In order to form a limited liability company, 1 or more authorized persons must execute a certificate of formation. The certificate of formation shall be filed in the office of the Secretary of State and set forth:

(1) The name of the limited liability company;
(2) The address of the registered office and the name and address of the registered agent for service of process required to be maintained by § 8-104 of this title; and
(3) Any other matters the members determine to include therein.

6 Del. Code Ann. §18-201(a).

39

Turning to subsection (a)(2), Narendra and the three Winklevosses were admitted as members effective April 6, 2004, in accordance with the Operating Agreement. Nevertheless, since the Operating Agreement was executed subsequent to the filing of the complaint, the time provided in its terms, i.e., April 6, 2004, cannot control the diversity analysis as previously discussed. Moreover, no ConnectU records reflecting the admission of any members to the LLC prior to September 2, 2004, have been proffered by the parties.[20] In sum, for purposes of diversity, under Delaware law there were no members of ConnectU before or at the time of the formation of the LLC.

In its post-hearing brief ConnectU queries: "Assuming that **ANY** Members were admitted at ConnectU LLC's formation, who got to decide who they would be?" (#255 at 8, emphasis in original) The Plaintiff then engages in a somewhat tortured analysis to reach the conclusion that whoever were among the various possible decision makers, "the relevant people agree that Divya Narendra was not a Member at formation." (#255 at 9) There is no need to

---

[20] The Operating Agreement provides for the admission of persons as a members of the LLC so there is not need to consider when the person's admission is reflected in the records of the LLC under 6 Del. Code Ann. §18-301(a)(2). In any event, the only two ConnectU documents naming "members" of the LLC which predate the filing of the complaint, a ConnectU application to do business in Connecticut (Exh. #40) and the documents submitted to Wachovia Back by ConnectU (Exh. #42), do not reflect anyone's admission to the LLC.

engage in such circumlocution; there simply is no requirement under Delaware law that there be members of an LLC at formation and, for purposes of the diversity discussion, there were none.

Moving on, with respect to membership subsequent to the formation of an LLC, subsection(b)(1) of 6 Del. Code Ann. §18-301 is applicable. That provision basically delineates two sets of circumstances in which a person may become a member after the formation of an LLC, either "at the time provided in and upon compliance with the limited liability company agreement" or "upon the consent of all members and when the person's admission is reflected in the records of the limited liability company." 6 Del. Code Ann. §18-301(b)(1).[21] Once again, the time provided in the Operating Agreement is not decisive in the

---

[21]

The pertinent statutory provision reads in full:

> (b) After the formation of a limited liability company, a person is admitted as a member of the limited liability company:
> (1) In the case of a person who is not an assignee of a limited liability company interest, including a person acquiring a limited liability company interest directly from the limited liability company and a person to be admitted as a member of the limited liability company without acquiring a limited liability company interest in the limited liability company at the time provided in and upon compliance with the limited liability company agreement or, if the limited liability company agreement does not so provide, upon the consent of all members and when the person's admission is reflected in the records of the limited liability company.

6 Del. Code Ann. §18-301(b)(1).

Narendra is not an assignee of an interest in ConnectU.

context of the diversity calculus.  Since there were no members of ConnectU at

the formation, there were no members to consent to Narendra's membership on

or before September 2, 2004, and there are no LLC records reflecting his

admission on or before that time.  The bottom line is that pursuant to Delaware

law for diversity purposes there were no members of ConnectU on the date the

complaint was filed.

> For their part, the Defendants posit that:

> > The threshold inquiry for the Court is "what is a
> > member" for purposes of the LLC Act?  Remarkably few
> > courts have addressed this question.  The definition of
> > "member" set forth in Del. Code Ann. §18-101(11),
> > which simply describes a member as someone admitted
> > as provided by Del. Code Ann. §18-301, also provides
> > little guidance.

Facebook's Supplemental Opposition #271 at 3.

To the contrary, as detailed above, the Court finds the relevant provisions of

Delaware law to be plain and straightforward.  That the result of applying those

provisions might be unexpected is a consequence of the anomalous analysis

which must be undertaken in order to determine diversity on September 2,

2004.

> In any event, the Defendants argue that the Court should consider a wide

array of factors in order to decide the membership of ConnectU on the date the

complaint was filed. The cases upon which the Defendants' rely are inapposite given the facts and circumstances at hand.[22]

At the outset, the Defendants contend that

> The [Delaware Limited Liability Company] Act can be characterized as a "flexible statute" because it generally permits members to engage in private ordering with substantial freedom of contract to govern their relationship, provided they do not contravene any mandatory provisions of the Act. Indeed, the LLC has been characterized as the "best of both worlds."

*Elf Atochem North America, Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. Supr., 1999)(footnotes omitted).

In the *Elf* case, the plaintiff and another individual, Cyrus A. Jaffari, and his company, Malek, Inc., decided to undertake a joint venture in the form of an LLC to market a maskant to the aerospace industry. *Elf*, 727 A.2d at 287-288. A Certificate of Formation in Delaware to form Malek LLC was filed, and thereafter the parties entered into certain agreements with respect to the operation of the LLC, one of which the court considered to be the Operating Agreement. *Elf*, 727 A.2d at 288. Provisions of that Operating Agreement included an arbitration clause which was to cover all disputes as well as a forum

---

[22]

Likely because the issue to be decided at this juncture is so discrete and unique, neither party has cited case law on point.

43

selection clause. *Elf*, 727 A.2d at 288.

Elf ultimately sued Jaffari and Malek, Inc. both individually and derivatively on behalf of Malek LLC for breach of fiduciary duty, breach of contract, and so on, after Jaffari allegedly took money from Malek LLC for his own purposes. *Elf*, 727 A.2d at 289. The lower court dismissed the case in light of the arbitration clause and Elf appealed. *Elf*, 727 A.2d at 289.

After summarizing the background of the Delaware Limited Liability Company Act, the Delaware Supreme Court observed that

> The basic approach of the Delaware Act is to provide members with broad discretion in drafting the Agreement and to furnish default provisions when the members' agreement is silent. The Act is replete with fundamental provisions made subject to modification in the Agreement (e.g. "unless otherwise provided in a limited liability company agreement....").

*Elf*, 727 A.2d at 291 (footnotes omitted).

The Court noted that it is the Operating Agreement that is of primary importance and will be enforced unless "inconsistent with mandatory statutory provisions." *Elf*, 727 A.2d at 292. It was determined that since the members of the LLC had signed the Operating Agreement, the arbitration and forum selection clauses would be enforced even though Malek LLC was not a signatory

to the Operating Agreement. *Elf*, 727 A.2d at 293.   Further, the Delaware Supreme Court ruled that, by contract, members of an LLC could alter the default jurisdiction provisions of the Delaware Act. *Elf*, 727 A.2d at 295.

The Court in this case acknowledges that the Delaware Limited Liability Company Act should be construed flexibly and that the members of LLCs are afforded broad powers to fix contractually the terms and conditions of their relationship.  The issue to be decided at this point does not, however, involve the Operating Agreement or the breadth of the parties' right to contract.

The pertinent issue in the *In re Grupo Dos Chiles, LLC* case was whether the membership of the LLC could be altered without an amendment to the Certificate of Formation. *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, *2.  In February, 2000, a certificate of formation for the Grupo Dos Chiles, LLC ("Grupo") was filed in Delaware naming Jamie Rivera as the "initial member." *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, *1. The following month, Alfred Shriver and Yolanda Martinez[23] who then enjoyed a personal relationship, signed an LLC Agreement with respect to Grupo in which they were named "managing partners." *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, *1.  In

---

[23] Rivera is Martinez's son. *In re Grupo Dos Chiles, LLC*, 2006 WL 668443, *1.

June of 2003 Grupo failed to pay Delaware taxes and so lost its good standing in the state. *In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *1.

In December, 2004, Shriver commenced an action in Virginia to wind up the affairs of the LLC since the LLC had been dissolved by operation of law in Delaware and he and Martinez "were at an impasse." *In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *1. The following month, Martinez, on her own, paid the back taxes for Grupo and so returned the LLC to good standing. *In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *1. This act by Martinez caused Shriver to sue.

Before discussing the issues raised, the court noted that

> Both sides to this dispute have put too much emphasis on formalities. The Court considers the underlying facts and course of dealing among the parties at least equally important. Thus, the Court will examine the arguments based on the formalities in light of the facts and evidence of the parties' intentions.

*In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *2.

The court concluded that it did not matter that the certificate of formation named only Rivera as a member of the LLC because "the Agreement, entered into in March 2000, makes it clear that Shriver and Martinez are the members [and] [t]he Agreement superceded the CoF." *In re Grupo Dos Chiles, LLC,* 2006

WL 668443, *2. The fact that Shriver and Martinez were named "Managing Partners" in the Agreement rather than "members" was deemed to be semantics and insignificant. *In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *3. The court relied on documentary evidence to underscore the parties' intent that Shriver and Martinez were members of the LLC. *In re Grupo Dos Chiles, LLC,* 2006 WL 668443, *3.

In the *In re Grupo Dos Chiles, LLC* case the court was addressing an ambiguity in the language of the parties' LLC agreement and, in doing so, considered extrinsic evidence. The case at bar involves a straightforward application of the provisions of the statute for which there is no need to consider the parties' course of conduct or other such evidence.

As discussed earlier, the court in *611, LLC,* 2006 WL 2038615, had to determine whether diversity in the federal court existed following removal from the state court. In particular, the question raised was whether either of the two plaintiffs, 611, LLC or American First Management, Inc., "qualifie[d] as a 'member' of [defendant] U.S. Lubes for diversity purposes", an "inquiry requir[ing] close factual and textual analysis...[with] not much relevant case law." *611, LLC,* 2006 WL 2038615,**1-2. The analysis involved a dissection of

47

the U.S. Lubes, LLC Operating Agreement in order to determine whether 611, LLC, after American First Management, Inc. conveyed its interest in U.S. Lubes to 661, LLC, was an Assignee or a Substitute Member of U.S. Lubes, LLC. *611, LLC*, 2006 WL 2038615,**2-3.  After reviewing all of the evidence the court concluded that:

> In light of the Agreement's ambiguities and the parties' conduct, the plaintiffs had reasonable grounds for believing then, and claiming now, that 611 satisfied the requirements for becoming a Substitute Member of U.S. Lubes.  Although 611 could have sought formal confirmation of this proposition, U.S. Lubes acted in a manner consistent with 611's perceived status as a member until this litigation commenced.

*611, LLC*, 2006 WL 2038615, **5-6.

While the *611, LLC* decision certainly stands for the proposition that it is permissible to consider extrinsic evidence when construing an ambiguous agreement, the terms of the Operating Agreement are not at issue in the diversity analysis in the present case.

In the case of *Matthews v. D'Amore*, 2006 WL 3095817 (Ohio App. 10 Dist., Nov. 2, 2006) upon which the Defendants rely (and cited with approval by ConnectU, *see* #275 at 2-3), the court examined Ohio law in order to resolve a dispute over membership in an LLC.  In particular, the court noted that:

Limited liability companies are governed by R.C. Chapter 1705. R.C. 1705.01(G) provides that a "member" of a limited liability company is "a person whose name appears on the records of the limited liability company as the owner of a membership interest in that company." "Membership interest" is defined by R.C. 1705.01(H) as "a member's share of the profits and losses of a limited liability company and the right to receive distributions from that company."

It is well-settled that "[t]he paramount consideration in determining the meaning of a statute is legislative intent." *State v. Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, at ¶ 34, *citing State ex rel. Asberry v. Payne* (1998), 82 Ohio St.3d 44, 47. To determine such intent, a court must first look at the words of the statute itself. "It is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent. If that inquiry reveals that the statute conveys a meaning which is clear, unequivocal and definite, at that point the interpretative effort is at an end, and the statute must be applied accordingly." *Provident Bank v. Wood* (1973), 36 Ohio St.2d 101, 105-106, *citing Sears v. Weimer* (1944), 143 Ohio St. 312. A court must also bear in mind that "[s]tatutes concerning the same subject matter must be construed in pari materia." *In re C. W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, at ¶ 7, citing *In re Hayes* (1997), 79 Ohio St.3d 46, 48. With these principles in mind, we conclude, reading R .C. 1705.01(G) and (H) in pari materia, that to be a "member" of a limited liability company, a person's name must appear on the company records as one who shares in the company's profits and losses and has a right to receive distributions from the company.

*Matthews*, 2006 WL 3095817, *8.

Applying the terms of the statutes literally, the court found that although the defendants had signed certain Articles of Incorporation and an Original Appointment of Agent form, those documents did not give the defendants the right to share in the profits or losses of, or receive distributions from, the LLC. *Matthews*, 2006 WL 3095817, *9. Since the defendants failed to meet the statutory prerequisites, it was concluded that they were not members of the LLC. The approach adopted by the *Matthews* court is similar to that employed in this case.

The Defendants cite a number of cases for the proposition that tax records can be considered as probative evidence of membership. *See, e.g., Hynansky v. Vietri*, 2003 WL 21976031 (Del. Ch., Aug. 7, 2003); *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681 (Del. Ch., Jan. 29, 2002). These cases are off the mark. The tax returns in the present case were completed after the Operating Agreement had been executed and so focus little, if any, light on the state of the facts as they existed on September 2, 2004. Due to the factual circumstances in this case, the tax returns really are not relevant in the context of applying the pertinent statutory provisions. Similarly, purported judicial and

taxpayer statements regarding Narendra's membership status do not appertain.

Even if it were to be concluded that evidence of the parties' intentions and course of conduct was relevant in determining the membership of ConnectU LLC on September 2, 2004, based on the record before the Court, that evidence does not establish that ConnectU had any members as of the date the complaint was filed. The Winklevoss brothers and Narendra were consistent in testifying that Tyler Winklevoss was the individual who contacted the Company Corporation and had ConnectU LLC set up in Delaware. (#261 at 18, 23; #262 at I-262, I-270; #263 at II-5) Tyler testified that it was his company because he set it up and therefore he believed that he had the right to bring in other members. (#261 at 23, 30) In Tyler's view Narendra was "part of the website development team" but not part of the company because he planned to leave to take a job in New York after the website launched and the LLC would run the website going forward. (#261 at 33)

All three also testified that in or about the time that the LLC was formed, i.e., the spring of 2004, they gave little, if any, thought as to who the members of the LLC were. Rather, following the launch of the Facebook website in February, 2004, the focus was the scramble to get their website up and running in order to compete. Moreover, the three were close college friends who trusted

each other to do the right thing; the legal formalities or their implications simply were not the subject of consideration or discussion. (*See, e.g.,* #261 at 54, 63-66; #262 at I-262) As Narendra testified, there was no agreement as to how the LLC would be run on a day-to-day basis, nor did he even think about it: "We were thinking about getting our website started and launched as fast as we possibly could." (#263 at II-4; *see also* #261 at 17-18, 36; #262 at I-182 - I-183) Indeed, Narendra testified, and the Winklevoss brothers echoed similar sentiments, that:

> Q. When ConnectU LLC was formed did you expect to be named as a member of that company?
>
> A. No.
>
> Q. When ConnectU was formed did you expect to have any kind of a company position?
>
> A. No.
>
> Q. Why not?
>
> A. It just really wasn't my concern. First of all I was busy on the actually website (sic) developing the website, dealing with, you know, I mean just sort of coming up with ideas and figuring out what to do with the website but also, you know, I think more importantly I mean, you know, at that point TheFaceBook had launched, it had been up and running for, you know, probably two months and we

were sort of scrambling to figure out ways to compete with TheFaceBook in, you know, I think all the, a lot of the legal issues that, you know, sort of come up now just were sort of the farthest away from my mind because, you know, we, you know, first and foremost if we were trying to figure out what do we do, we've got this website that going really quickly, we've got a mountain to climb as far as sort of getting, you know, at that level. How do we do that? How do we overcome that challenge and, you know, membership and, you know, the status of the LLC wasn't really an issue at that time.

#263 at II-6 - II-7; *see also* #261 at 68, 74; #262 at I-182 - I-183.

When discussions about ownership of the LLC occurred around the time of formation, they were very informal with the issue not being agreed upon until shortly before the Operating Agreement was signed in 2005. (#263 at II-11)   Narendra did not recall any specific discussions with the Winklevoss brothers regarding who would be the members of ConnectU LLC, rather it was "understood" that the brothers were members and Narendra was not. (#263 at II-72)

The Plaintiff has submitted two documents (Exh. ##40,42[24]) reflecting "members" of the LLC prior to September 2, 2004.  With respect to the

---

[24]

Exhibit #41 which is a second application by ConnectU LLC to do business in Connecticut postdates the filing of the complaint.  Plaintiff's counsel has stipulated that these three documents (Exh. ##40-42) were not included in the document production ordered by the court in the California litigation. *See* #262 at I-256 - I-258.

Wachovia bank documents (Exh. #42) whereby a checking account for the LLC was established, Cameron and Tyler Winklevoss were indicated to be members and Howard Winklevoss and Marie Antonelli were indicated to be managers. (Exh. #42; #261 at 46-47)  Tyler Winklevoss testified that he signed the signature card, but the words "member" and "manager" were not in his handwriting and he had no recollection as to whether the words were there when he signed his name. (#261 at 98-99)  Cameron Winklevoss testified that he believed that Marie Antonelli had printed the word "member" on the signature card and that the word was there when he signed it. (#262 at I-999 - I-200)

The August 15, 2004 application to do business in Connecticut was prepared by Marie Antonelli and she signed it on Cameron Winklevoss' behalf. (Exh. #40; #262 at I-189 - I-190)  Both Cameron and Tyler Winklevoss were identified as members on that form. (Exh. #40; #262 at I-191 - I-192)

While the Winklevoss brothers testified that the information on the application to do business in Connecticut and the Wachovia bank documents was correct, given the circumstances of their creation and in light of all the other evidence, the Court does not find these documents to be dispositive or particularly persuasive on the membership issue.

54

To summarize, none of the cases cited by the Defendants persuades the Court that its application of 6 Del. Code Ann. §18-301 is incorrect. Further, the Court does not find that consideration of the parties' course of conduct or intentions warrants a different result. Although the parties have struggled valiantly, each in their own way, to establish members of ConnectU on September 2, 2004, in the snapshot under Delaware law, there were none.

Given that an LLC is a citizen of the state or states of which its members are citizens, having no members effectively rendered ConnectU stateless when the complaint was filed. In these circumstances, the Plaintiff cannot meet the requirements of Title 28 U.S.C. §1332(a)(1) that the dispute be between citizens of different states and, as a result, the complaint should be dismissed for lack of subject matter jurisdiction. *See, e.g., Newman-Green*, 490 U.S. at 828-830 (an individual defendant's "'stateless' status destroyed complete diversity"). Having reached this conclusion, the Court need go no further.

To the extent that the issue becomes relevant, the legal and factual basis supporting the finding that Zuckerberg was a resident of New York on September 2, 2004 shall now be detailed. The applicable standard is undisputed:

Federal jurisdiction based on diversity of citizenship requires that the matter in controversy be between citizens of different states. 28 U.S.C. §1332(a)(1). For purposes of diversity, a person is a citizen of the state in which he is domiciled. *Lundquist v. Precision Valley Aviation, Inc.*, 946 F.2d 8, 10 (1st Cir. 1991); *Rodriguez-Diaz v. Sierra-Martinez*, 853 F.2d 1027, 1029 (1st Cir. 1988); *Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc.*, 806 F.2d 1128, 1132 (1st Cir. 1986). "A person's domicile 'is the place where he has a true, fixed home and principal establishment, and to which, whenever he is absent he has the intention of returning.'" *Rodriguez-Diaz*, 853 F.2d at 1029 (quoting C. Wright, A. Miller & E. Cooper, 13B Federal Practice & Procedure §3612, at 526 (1984)). Domicile is determined as of the time the suit is filed, and once diversity jurisdiction is established, it is not lost by a later change in domicile. *Lundquist*, 946 F.2d at 10; *Valedon Martinez*, 806 F.2d at 1132; *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 701 (1st Cir.1979).

*Bank One, Texas, N.A., v. Montle*, 964 F.2d 48, 49 (1 Cir., 1992).

The First Circuit has further indicated that

The factors relevant to determining a party's intent include:

the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment.

56

> *Lundquist*, 946 F.2d at 11-12 (quoting 1 *Moore's Federal Practice*, ¶0.74 [3.-3], at 788). While no single factor is controlling, some courts have established a presumption of domicile in the state in which a party is registered to vote. 1 *Moore's Federal Practice*, ¶0.74[3.-3] at 787. This court has not recognized such a presumption, but we have said that the place a person is registered to vote is a "weighty" factor in determining domicile. *Lundquist*, 946 F.2d at 12.

*Bank One*, 964 F.2d at 50.

Bearing these factors in mind, the evidence adduced regarding Zuckerberg's domicile shall be examined.

Zuckerberg was born in White Plains, New York and went to elementary school and the first two years of high school in Ardsley, New York. (#220 at 137-138) As of the date of the evidentiary hearing, June 22, 2006, Zuckerberg was twenty-two years old. (#220 at 138)

For his junior year of high school in 2000, Zuckerberg went to, and lived on campus at, Philips Exeter in New Hampshire. (220 at 129; 138) Zuckerberg could not remember if he spent the entire summer after his junior year of high school with his parents, but he definitely spent the summer after his senior year away. (#220 at 129-130) Zuckerberg did not live with his parents the summer following his freshman year at Harvard and the summer after his sophomore

year he went to California.[25] (#220 at 130-131)  The last time prior to his April 25, 2006 deposition that Zuckerberg visited his parents for an extended period of time was December-January, 2005/2006. (#220 at 131-132)

As of the date of the evidentiary hearing, Zuckerberg lived at 259 Ramona Street in Palo Alto, California. (#219 at 15)  From mid-June through mid-September, 2004, he lived at 819 La Jennifer Way in Palo Alto, California. (#219 at 16)  Immediately prior to moving to La Jennifer Way, Zuckerberg had left Harvard University following the end of the Spring, 2004 term[26] and had spent two or three weeks at his family home at 2 Russell Place, Dobbs Ferry, New York. (#219 at 17)  The 2 Russell Place address was the one on the lease for La Jennifer Way. (#219 at 18)  When Zuckerberg moved to California in the summer of 2004, he would give his New York home address when he needed to give a permanent address.[27] (#220 at 101-102)

When he left his dorm room at the end of the school year, Zuckerberg

---

[25]

Zuckerberg never considered either New Hampshire or Massachusetts where he went to school to be his permanent residence. (#220 at 139-140)

[26]

Zuckerberg had lived on campus at Harvard during the Spring 2004 term. (#219 at 17) He had completed his sophomore year of college before going to California in June of 2004. (#219 at 44)

[27]

Zuckerberg further testified that he used his Dobbs Ferry address on documents if he needed to receive mail since it was a place to which he could always return. (#221 at 172-173)

moved his personal belongings into storage in Kirkland House, his dormitory, because he intended to go back to Harvard in the fall. (#219 at 19; 49)  At some point before the fall 2004 semester, Zuckerberg informed Harvard that he was cancelling his housing for the upcoming term and he was granted a leave of absence by Harvard effective May 28, 2004. (#219 at 29-30; 34-35)  When Zuckerberg sent the letter to Harvard with respect to housing for the fall, his intention was to leave the university for a term or two; he wanted to graduate from Harvard. (#221 at 165)  At the end of the summer Zuckerberg went back to Harvard, took his possessions out of storage, brought some of them to his family home in New York and gave other things away. (#219 at 49; 50)

One of the reasons that Zuckerberg went to California for the summer in 2004 was because that was where start-up companies were located. (#219 at 42)  His intention was to "hang out" with other friends who would be out there and to work on expanding the Facebook to other schools. (#220 at 147-148) He only brought one bag of personal possessions with him to California. (#220 at 151)

Zuckerberg shared the La Jennifer Way sublet with five other friends who were also students. (#220 at 149)   Dustin Moskovitz ("Moskovitz"), Zuckerberg's roommate at Harvard, spent the summer of 2004 in California

with Zuckerberg and was still there at the time of the evidentiary hearing. (#219 at 43)  Andrew McCollum, a friend of Zuckerberg from Harvard, also spent the summer of 2004 in California. (#219 at 43)  Zuckerberg was not even thinking about staying in California when he first went out; it was a "cool place" to spend the summer with his friends and then go back to Harvard. (#220 at 151-152)

TheFacebook Inc. was incorporated on July 29, 2004 by California attorneys retained by Zuckerberg. (#219 at 71) Zuckerberg signed TheFacebook Inc.'s certificate of incorporation prepared by his attorneys on July 26, 2004. (#219 at 74-75)  The La Jennifer Way address was on that document, but Zuckerberg did not know who had typed it and did not attach any significance to it in any event. (#219 at 75-76)  On a number of documents relating to TheFacebook Inc. that Zuckerberg signed in or around the fall of  2004, Zuckerberg's California address was listed. (#219 at 80-100;  #220 at 1)

The original agreement between TheFacebook Inc. and Equinex,  a co-location facility in California[28], is dated on or about August 8, 2004. (#219 at

---

[28]

Zuckerberg testified that "[w]hen you're running a website with a bunch of servers you need a place to put the servers and so there are these [co-location] facilities which specialize in storage and they provide all the things that you need for the server." (#219 at 73)

72-73; #220 at 103-104) Zuckerberg signed that agreement and used the New York address. (#220 at 104)  In late August or September of 2004, Zuckerberg transferred all of the data from the servers housed at Savvy[29], a co-location facility in New York, to those located at Equinex. (#219 at 23-27; 72-73) Thereafter TheFacebook.com was run from California. (#219 at 27; 74)

By mid to late August, 2004, Zuckerberg believed that Facebook would be receiving about $550,000 in funding. (#221 at 193)  During the summer of 2004 Zuckerberg had spent a fair amount of the money that his parents had saved for his college education, but he was able to pay that money back within a short period of time when an initial infusion of venture capital was received in September of 2004. (#219 at 52-53)  As of September 2, 2004, Facebook had not received any funding from Venture Capital Investors. (#221 at 180) By that date, Zuckerberg's plan was to stay in California for a term or two, see how Facebook was doing and then return to Harvard. (#221 at 155-156; 181-182) It was not Zuckerberg's intention to drop out of Harvard. (#221 at 155) Sometime before September 11, 2004, Facebook had received its first venture funding. (#221 at 192-193)

---

[29] TheFacebook had been in a relationship with Savvy since the spring of 2004. (#120 at 111-112)

At the end of August, 2004, Facebook had less than fifty schools. (#221 at 186)  About one hundred more schools were added after they were fully moved into the Equinex facility which was around the second week in September. (#221 at 187-188)  Facebook had a million users as of December 1st or 2nd of 2004. (#221 at 188-189)  Zuckerberg had thought that as long as Facebook was not growing and changing at a massive rate, he could still run it and go back to school; he admittedly was wrong. (#221 at 196)

Zuckerberg moved out of the La Jennifer Way summer sublet around September 11 or 12, 2004, because his lease ran out. (#219 at 54)[30]  He went back to his family home in New York for a few days because he had not lined up another place to live in California. (#219 at 58)  At that time his intent was to go back to California for a short period of time. (#219 at 58)

From mid-September, 2004, until mid-January, 2005, he lived at 1743 Westbrook Avenue, Los Altos, California, in an unfurnished house. (#219 at 16; 60-61)  Zuckerberg signed the lease, but Facebook Inc. paid the rent. (#219 at

---

[30]

At some point before he moved out he bought a Ford Explorer from an individual on Craig's List in California. (#219 at 55-56)  Zuckerberg testified that he purchased the vehicle, but kept the registration in the name of the previous owner rather than registering the vehicle in his own name. (#219 at 55)  He could not recall sending any forms to the state of California to show that he owned the vehicle, nor did he remember the state of California sending him a new registration certificate or license plates. (#219 at 56)  He was unsure if perhaps it was registered to someone else who was living in the La Jennifer Way house. (#219 at 57)

61) They took a year lease on the Westbrook house because that was all that they could find at the time. (#221 at 208) A minimal amount of furniture was purchased for the house, i.e., a couch, a table, some chairs, etc., the cost of which was split with others living in the house. (#219 at 62) He did not buy a dresser for his clothes, he just piled them up. (#221 at 179) While living at the Westbrook Avenue address, Zuckerberg opened gas, electric and cable accounts in his name. (#219 at 63)

At some point between July 29, 2004 and November of 2004, someone changed the mailing address for TheFacebook Inc. bank account at the Silicon Valley Bank from the Dobbs Ferry, New York address to the Westbrook Avenue, Los Altos, California address. (#220 at 105-109) A TheFacebook Inc. Certificate of Deposit authorization form signed by Zuckerberg as CEO of Facebook Inc. on October 15, 2004, bore the Westbrook Avenue address, but he did not write it on the document. (#220 at 109-111)

In December, 2004, Zuckerberg leased a new Infiniti in California which was registered there in his name and for which he obtained insurance. (#219 at 57)

From mid-January through approximately mid-June of 2005, he lived at 1324 Sherman Avenue in Menlo Park, California. (#219 at 16) The move was

made to the Sherman Avenue location because one of Zuckerberg's roommates was having an allergic reaction to something in the Westbrook Avenue house. (#219 at 64)  Zuckerberg signed the lease for Sherman Avenue in his own name and in the name of TheFacebook. (#219 at 64)  For three months during the summer of 2005, he lived at Vasilakos Court. (#219 at 15)  In the fall of 2005 Zuckerberg moved into an unfurnished apartment on Ramona Street in Palo Alto, California. (#219 at 65)

Apart from some limited number of weeks, Zuckerberg has been living in California since the summer of 2004. (#219 at 43; 67)  As of the date of the evidentiary hearing, Zuckerberg had no current plans to return to Harvard. (#219 at 68)

Zuckerberg understood that a federal tax return for 2004 was prepared for him by his father's accountant, but it had not been filed. (#220 at 116)  As of the date of the evidentiary hearing, Zuckerberg had not filed a state tax return for 2004. (#220 at 116-117)  Zuckerberg's assistant and his accountant were working on getting the returns filed. (#220 at 119-120)  A completed but unfiled federal tax return reflects that Zuckerberg earned a total of nineteen thousand seven hundred eighty-three dollars ($19,783) in 2004, nineteen thousand three hundred and thirty-three dollars ($19,333) from Facebook and

four hundred and fifty dollars ($450) from Harvard. (#220 at 121-122)  All of

the income that Zuckerberg earned from Facebook in 2004 he received after

Facebook Inc. was incorporated on July 29, 2004. (#220 at 122-123)

Zuckerberg had a New York license from the time he was sixteen until

approximately two months before the evidentiary hearing when he obtained a

California license. (#221 at 168)

In 2004, Zuckerberg had a student checking account at Fleet/Bank of

America in New York and a joint savings account with his mother at Smith

Barney in New York. (#221 at 178)  He also had a credit/debit card with his

checking account and a joint account on a Citibank MasterCard with his father.

(#221 at 178)  The statements from all of these accounts went to his home in

Dobbs Ferry. (#221 at 178)

After Zuckerberg moved to California, the only financial assistance his

parents gave him was to pay for his cell phone and his health insurance up until

the time that Facebook Inc. began to pay the health insurance premiums. (#220

at 134)

Although Zuckerberg does not remember having registered to vote, he is

in fact registered to vote in Westchester County, New York. (#220 at 135)  He

does not remember ever having voted. (#220 at 136-137)  Zuckerberg has

never been registered to vote anywhere but New York. (#221 at 170)

When he went to California in 2004, Zuckerberg was a twenty year old college student off to spend a summer hanging out with his friends in the mecca of the start-up world. He moved into a summer sublet shared by a group of his college friends with one bag of possessions; his personal property was left either in storage at his dorm at Harvard or at his parents' house in New York. Even in mid-September when Zuckerberg moved into an unfurnished house with his friends after the sublet ran out, they only purchased the bare essentials for furniture.

While he was living in the summer sublet Zuckerberg did buy a SUV online, but he did not remember whether he registered the vehicle[31] or if, perhaps, it was registered in another person's name. It was not until December of 2004 that he leased an Infiniti which was registered in his own name and insured.

Zuckerberg routinely gave his permanent address as Dobbs Ferry, New York as, for example, on the La Jennifer Way lease and the Equinex contract.

---

[31]

Indeed, likely because it was the first car that he ever bought (#221 at 183), Zuckerberg did not seem to be aware that he was obliged to register the vehicle in his own name rather than leaving it in the name of the prior owner.

While various California addresses were used on other documents, for example, the documents involved in the incorporation of TheFacebook Inc., in large measure people other than Zuckerberg had completed the forms and he attributed no importance to the addresses used.

While Zuckerberg is registered to vote in New York, that factor can be accorded little weight given that he has never voted and did not recall that he, in fact, was registered. He did hold a New York license from the time he was sixteen up until 2006. In 2004, his personal bank accounts and credit cards were all from New York.

Based on Zuckerberg's testimony, which the Court credits, in September of 2004, his intent was to stay in California for a semester or maybe two to work on Facebook and see how it would go, but then he planned to return to school at Harvard. It was only after the infusion of capital and the move into Equinex in mid to late September, 2004, that Facebook began to take off exponentially and the landscape changed. Considering all of the testimony elicited, the Court does not find that on September 2, 2004, California was "'the place where [Zuckerberg] ha[d] a true, fixed home and principal establishment, and to which, whenever he is absent he has the intention of returning.'" *Rodriguez-Diaz* v. Sierra-Martinez, 853 F.2d 1027, 1029 (1 Cir., 1988) (quoting

67

C. Wright, A. Miller & E. Cooper, 13B *Federal Practice & Procedure* §3612, at 526 (1984)). Rather, at the time the complaint was filed, Zuckerberg's domicile was in New York.

## IV. *Conclusion and Recommendation*

For all the reasons stated, diversity of citizenship did not exist on September 2, 2004 and, consequently, the Court had no subject matter jurisdiction over the complaint when it was filed. Therefore I RECOMMEND that Facebook Defendants' Motion To Dismiss #94 be ALLOWED.

## V. *Review by the District Judge*

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to these proposed findings and recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v.*

*Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

March 2, 2007