Pages 1 - 81

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Magistrate Judge

The Facebook, Inc., et al.,   )
                              )
          Plaintiffs,         )
                              )
  VS.                         )      NO. C 07-1389 RS
                              )
ConnectU, Inc., et al.,       )
                              )
          Defendants.         )
_____)
                              San Jose, California
                              Wednesday, July 11, 2007

<u>**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**</u>

**<u>APPEARANCES</u>**:
For Plaintiffs:
                              Orrick, Herrington & Sutcliffe
                              1020 Marsh Road
                              Menlo Park, California  94025
                    BY:       **THERESA SUTTON**
                              **I. NEEL CHATTERJEE**
                              **ATTORNEYS AT LAW**

For Defendants:
                              Finnegan, Henderson Farabow,
                              Garrett & Dunner LLP
                              Stanford Research Park
                              3300 Hillview Avenue
                              Palo Alto, California 94304
                    BY:       **SCOTT R. MOSKO**
                              **ATTORNEY AT LAW**

                    **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:                  Kelly L. Bryce,
                              Court Reporter Pro Tem


                    Computerized Transcription By Eclipse

**APPEARANCES**:  (CONTINUED)

For David Gucwa:

                                        DECHERT LLP
                                        2440 W. El Camino Real - Suite 700
                                        Mountain View, California  94040
                              BY:  **VALERIE MARGO WAGNER**
                                   **ATTORNEY AT LAW**

1    <u>Wednesday - July 11, 2007</u>                    <u>10:30 a.m.</u>

2

3          **THE CLERK:**  Calling case number C 07-01389 RS,

4    Facebook versus ConnectU.

5          **MS. SUTTON:**  Good morning, Your Honor.  Theresa

6    Sutton of Orrick, Herrington & Sutcliffe on behalf of the

7    plaintiffs.

8          **THE COURT:**  Good morning.

9          **MS. SUTTON:**  With me is Neel Chatterjee.

10          **THE COURT:**  Good morning.

11          **MR. MOSKO:**  Good morning, Your Honor.  Scott Mosko

12    on behalf of the moving parties in the motion to dismiss, and

13    then I'm representing a number of additional parties in the

14    Case Management Conference.

15          **THE COURT:**  Good morning.

16          **MS. WAGNER:**  And, Your Honor, Valerie Wagner making

17    a special appearance with respect to the Case Management

18    Conference for defendant David Gucwa.

19          **THE COURT:**  Good morning.

20          Okay.  Let me give you a couple of preliminary

21    comments.  The issue before us today, putting aside the Case

22    Management Conference, which we'll get to after we're through

23    the motion to dismiss for lack of personal jurisdiction, the

24    motion pertains to the defendants PNS, Pacific Northwest

25    Software, and Mr. Williams; and to just summarize the issues so

that you have some sense of the particulars that I would like
to hear some discussion concerning.

We all agree that there are two ways in which
jurisdiction, personal jurisdiction, could be asserted here;
general jurisdiction or specific jurisdiction.  And,
fortunately, this is not one of those cases where we have
disagreements as to what the government's standards are.
Everybody -- because, you know, there can't be any
disagreement, this is a well trod area, we have standards under
each.

Applying that to the case, let me give you some
sense of where I see that shaking out.  I don't see a basis
here for asserting personal jurisdiction under the general
jurisdiction prong against PNS and Mr. Williams.

I know that there is a run that's made by Facebook
to establish general jurisdiction; but I think that that
standard, that everybody agrees, requires a showing of
substantial, continuous, systematic contacts with the foreign
state.  I just don't see that showing being made.  Even
assuming I know there is some dispute about the amount of
business time in California by PNS and the like, I just don't
think it's sufficient for showing general jurisdiction.  I
won't foreclose discussion on it, but you should know that
that's my initial sense of it.

With respect to specific jurisdiction, again, I

1    think we all agree on the basic Ninth Circuit law as to the

2    criteria for determining that.

3           The interesting question here, and it is a very

4    interesting question, is that the defendants are, in this

5    instance PNS and Mr. Williams, are saying that there has to be

6    a showing that not only was there aiming, targeting, however

7    one -- whatever term we want to adopt, allegedly on their part;

8    but also when they were targeting and aiming, they knew they

9    were targeting and aiming at this forum, and that's an

10   interesting question.  And I'm not sure which way that that

11   comes out when we're talking about the cyber world in which we

12   are -- in which this case takes us to.

13          I think that the language of the cases certainly

14   talk in terms of aiming at a specific -- aiming at an entity

15   which the party knows is in a particular forum, but I also

16   recognize that those cases arise in a different context than

17   the one we have now.

18          So the big question I think here is:  Is that a

19   requirement in this case?  I mean, is it -- putting aside

20   whether or not Mr. Williams and PNS testimony is correct or not

21   correct, that they had no idea that California was the locus

22   for Facebook ultimately and whether or not there were

23   California customers who were involved and the like, is that

24   necessary?

25          Because I think what is fairly clear is the

1    allegation, at least, indicates that they knew -- PNS and

2    Mr. Williams knew they were targeting Facebook and they know

3    that their conduct was directed towards Facebook.

4          Do they have to know where Facebook is located?  And

5    that really is the central question.  Because I do think that

6    there is certainly an indication -- there is a sufficient

7    allegation that there was conduct going on that was directed

8    towards Facebook in this instance; sufficient, in general, to

9    provide a jurisdictional basis, but there is some question

10   about whether or not that additional element is necessary when

11   we are talking about this kind of virtual world in which we

12   find ourselves.

13         So, why don't I look first to Ms. Sutton on that

14   question.

15         **MS. SUTTON:**  Thank you, Your Honor.

16         I think that the Court has isolated the exact

17   problem here, and it's that the activity in this case has

18   happened in the cyber world.  So the cases we've all relied on,

19   *Calder* and *Schwarzenegger*, don't address that.  So the answer

20   to your question is, no, you do not have to know specifically

21   where Facebook was at the time you targeted us.

22         **THE COURT:**  And for support for that concept where

23   do I look?

24         **MS. SUTTON:**  I withstand -- unfortunately, it was

25   the first thing they raised.  It was in their reply.  So

yesterday we filed a couple supplemental cases.  One arises out

of the Western District of Washington.  The --

          **THE COURT:**  Have they seen that?  Has Mr. Mosko had

a --

          **MS. SUTTON:**  He should have.  It was filed

yesterday, and I have copies here and I'm happy to give you all

copies.

          The other emanated from the Eastern District of

Virginia, *Verizon versus Ralsky*, and that case is directly on

point here; and essentially what this case says is, you cannot

deliberately intentionally target a specific plaintiff and then

bury your head in the sand and pretend you don't know where

they are.

          The way that the cyber world or the Internet works,

Your Honor, as you know, you don't know necessarily where you

are.  The *Ralsky* case is a spamming case which is what we have

here.  In that case they had hundreds of people who conspired

to collect millions of e-mail addresses and spam them.  The

Court said, when you deliberately put in the e-mail addresses

and send out the commercial e-mail, you know that you are doing

something wrongful and you are intending to send those.

          What the Court also says is, there's nothing in the

e-mail address that tells you where the geographical location

is, and that's fine.  This court -- the *Ralsky* court says, you

can't possibly know.

1    **THE COURT:**  So you may be subjecting yourself to the

2    jurisdiction of a court and you don't know you're doing that,

3    but that's okay, according to your argument.

4    **MS. SUTTON:**  Exactly.  You take the risk.  When you

5    intentionally engage in wrongful conduct in spamming millions

6    of users, you take the risk that you are going to be hailed

7    into court wherever those e-mails go and whoever you affect.

8    **THE COURT:**  From a policy perspective certainly

9    arguments can be made that that's the way it ought to be.  But

10   what I'm asking, and perhaps these cases that you've filed on a

11   supplemental basis go to this question, and I'll certainly take

12   a look at them and give PNS and Mr. Williams an opportunity to

13   respond to them, but the issue is:  Is that where the law is

14   now?  I mean, where do I look?  Are these cases the ones that

15   address this question or is it just a policy issue you're

16   arguing?

17   **MS. SUTTON:**  They address that question.

18   **THE COURT:**  Okay.  All right.

19   **MS. SUTTON:**  In the *Ralsky* case -- and I'm happy to

20   give a copy to Your Honor if you'd like to see it.

21   **THE COURT:**  Okay.  This is the one out of the

22   District of Virginia?

23   **MS. SUTTON:**  Yes, it is.

24   **THE COURT:**  Okay.

25   **MS. SUTTON:**  I mean, that was exactly the issue in

1     this case, that the defendants admitted there were allegations

2     that there were millions of spam e-mails that went out.  The

3     defendants said, "But we didn't know where Verizon was."  And

4     the Court said, "You knew exactly what you were doing.  You

5     were targeting Verizon's servers sending out these e-mails."

6              And you cannot avoid jurisdiction by burying your

7     head in the sand and pretending you don't know where they are.

8     It doesn't matter.  The intent was you put in the address and

9     you sent the e-mail.  You had to know that wherever you engaged

10    in your tortious conduct that you would be called into court

11    there.

12             **THE COURT:**  Well, so, there's really, under your

13    theory, once you're in the cyber world, there's no limits.  You

14    can get -- what is the limit, perhaps, is the better question.

15    What area -- is it just open season in every jurisdiction in

16    the United States?

17             **MS. SUTTON:**  Well, it's in the nature and the

18    quality of the contacts, Your Honor.  In this case where the

19    nature and quality of the contacts was what resulted in the

20    tortious conduct that's what you look at.  And all the cases,

21    even the cases you want to look at for *Calder* and *Burger King*

22    and *Schwarzenegger*, they also tell you, they instruct to look

23    at the nature and quality of the contacts.  That's exactly

24    what's happening here.

25             Now, back in 1984 when *Calder* was issued, they

didn't have Internet problems like we do now. *Burger King* came out and said, "You don't have to be present in the state. It just needs -- your act needs to not be fortuitous, random, or attenuated." That's what we have here. It was an intentional act. There's nothing random or fortuitous about what the defendants did.

So a couple years later in 1997 the *Zippo* case comes out. They start looking at what happens in the Internet world. They start applying a sliding scale. If you have passive Internet, passive Web sites where you're just posting things, courts generally don't find jurisdiction there. The other side of that where you engage in a lot of contract making and interaction with the consumer, they're buying things, there's generally jurisdiction in those cases.

We take one step further in this case with *Ralsky* and the Court says, "Okay. You are now sending spam." I mean, the *Burger King* case and *Zippo* were out before the CAN-SPAM Act was even a law. So they couldn't have addressed this.

So we've come further now. The law is kind of evolving over time, and now we have the CAN-SPAM Act and it can't be that in order to be liable under the CAN-SPAM Act, that you have to know every place where your e-mails are going.

But in our case, Your Honor, as you probably know from the papers, they did know where the e-mails were going. They took UCLA e-mail addresses. They took Stanford e-mail

addresses.  They took Berkeley e-mail addresses.  They can't

sit here and say they didn't know that they were coming into

California.  It's absurd.

They knew precisely where their e-mails were going,

and they knew precisely they were targeting Facebook.  And they

can bring in a last-minute declaration and say, "Oh, We didn't

know you were in California."  A, I think that's a little

disingenuous; b, they can't defeat jurisdiction by coming in

after the fact and baldly asserting that they didn't know, and

they did.  They specifically targeted Facebook.

And this *Ralsky* case, Your Honor, goes through the

*Calder* elements under sort of this evolving backdrop of case

law; and in this case, with very similar facts to ours, it says

that, with this backdrop in mind going from *Calder* to *Burger*

*King* to *Zippo*, that *Calder* and its progeny, counsel at personal

jurisdiction is appropriate in this case.  I'm at page 12,

Your Honor, I'm sorry.

**THE COURT:**  Okay.

**MS. SUTTON:**  The Court goes on to say:  (reading)

"Defendants alleged acts of transmitting

millions of UBE" -- which is their acronym for

commercial e-mail -- "to and through Verizon

servers were clearly intentional."

This is the first prong intent.

It goes further, the top of the second column it

says: (reading)

>"In addition, these e-mails were expressly
>aimed at Verizon's servers, seven of which are
>located in Virginia. Defendants alleged
>transmissions of millions of UBE to and through
>Verizon servers in Virginia can hardly be
>considered random, fortuitous, or attenuated
>contacts."

**THE COURT:** Is there a discussion in this case on the question of whether or not the defendants were aware of the fact that these servers were located, physically located, in Virginia? I mean, is that an issue that gets fleshed out here or is that --

**MS. SUTTON:** They claim not to know.

**THE COURT:** They claim not to know.

**MS. SUTTON:** They claim they do not know.

**THE COURT:** So it's similar in this case in the sense -- all right.

**MS. SUTTON:** Yes. And, in fact, this case also says that you cannot come in at the last minute and put in an affidavit, "I didn't know," and then get out of it.

**THE COURT:** All right.

**MS. SUTTON:** At best it's something that needs to be fleshed out on the merits. That's what this case says.

**THE COURT:** All right. With respect to general

1   jurisdiction, again, I don't want to foreclose you from your

2   argument if you want to make it, but, in fairness, I'm telling

3   you I'm skeptical about whether or not you're going to be able

4   to carry the day on that prong.

5          **MS. SUTTON:**  Right.  Thank you, Your Honor.  I do

6   want to speak briefly about that.

7          **THE COURT:**  Okay.

8          **MS. SUTTON:**  So, as you know, basically the cases

9   want to know:  Is the defendant essentially present in the

10  state?  That's the question.  It is:  Do they do substantial

11  business here or do they do systematic and continuous business?

12         If you look at Pacific Northwest Software and their

13  activities over their 10 years of being in business, most of

14  that time they've been in California in different ways.

15         Now, the defendants want to take each little contact

16  piecemeal, look at it under a microscope, and say, "That's not

17  enough."  Well, under *Coremetrics*, you need to look at the

18  totality of the circumstances.  You look at the economic

19  realties of what's going on and then you determine.

20         *Coremetrics* also talks about the central -- this

21  being central to the business.  Defendants sort of couch that

22  as, "Well, they don't really make enough money here, so it

23  can't possibly be central to their business."  But the central

24  to the business prong to this is that you are doing in the

25  forum state what it is you do.  PNS develops software.  They

come to California, they develop software.

The idea that they don't have a presence here or don't have an office here is absurd in light of the evidence, first of all.  PNS testifies their Web site says, "We're virtual.  We don't really have an office."  Mr. Taves has testified that, "We don't have phones.  We don't have offices.  People just work wherever they are.  If they need equipment, we'll buy it."

Well, they have at least one man who has been here for two years and he's still here.

**THE COURT:**  Which man?

**MS. SUTTON:**  Mr. Benedict.

**THE COURT:**  Well, but he's an independent contractor.

**MS. SUTTON:**  He's an independent contractor developing or generating revenue for Pacific Northwest Software.

**THE COURT:**  If I hired an architect in Illinois to design a house for me, you know, independent contractor, does that mean that I'm suddenly subject to suit in Illinois?

**MS. SUTTON:**  I guess it --

**THE COURT:**  I mean, the location of the independent contractor doesn't mean you're doing business in the state I don't think.

**MS. SUTTON:**  Oh, but I think in this instance it

does, Your Honor.  Mr. Benedict lives in Modesto.  He is

authorized to engage in client development on behalf of PNS.

He is authorized to sign contracts on behalf of PNS.  He meets

with clients here.  He's a lead developer for PNS.  He develops

software for PNS.  He generates revenue for PNS.  He's been

here for at least two years.

THE COURT:  Well, you could also interpret that as

he sells a service, his services, to PNS, meaning he's not an

employee; correct?

MS. SUTTON:  He's not.  I'm not sure that that

matters.  I can't point you to a case, unfortunately, on that;

but, again, you look to the totality of what's going on here.

PNS has been doing business in California since 2000.

THE COURT:  Right.  But your calculation, I think,

which I'll accept for purposes of discussion, is that something

like 7 percent of their revenue has come in.  I don't have the

exact figure.

And the other side has pointed out, and I hear your

point that it's a totality analysis, cases where much more

higher percentage of revenue has been ascribable to a company

and that's not been sufficient to find and they have not found

general jurisdiction.

So, while we have to look at all of it, it seems to

me that the particular pieces don't amount to a whole lot.

MS. SUTTON:  Right, but the one piece that we're

missing, which is very disturbing I think, is that they have an ownership interest in a company in California called the Records Portal Company.

        **THE COURT:** Right, 10 percent interest according to you.

        **MS. SUTTON:** And they have been working with them since 2004, and over this time they have acted as their sole software developer. In their papers they spell out --

        **THE COURT:** How about Mr. Benedict? I thought he was doing their development.

        **MS. SUTTON:** He does development for other companies.

        **THE COURT:** Okay.

        **MS. SUTTON:** So he goes out and gets other business and he does software development.

        **THE COURT:** Okay.

        **MS. SUTTON:** So for the Records Portal Company, Pacific Northwest Software has billed itself as their engineering team. They do all their software development. They -- Mr.Taves could not testify as to the amount of money they have made from Records Portal or what their 10 percent interest is equivalent to in terms of money.

        So we're missing, I believe, a big chunk of the revenue they've generated from California. They have not been able to testify about it. They didn't look at their records to

1    figure out what it was.  We tried to get it from Records Portal

2    and we've been blocked from getting that.  So we're missing a

3    huge part of what, I think, the revenue is that they've

4    generated from California.

5         I don't think that -- I don't think that the

6    $600,000 is it.  And Mr.Taves has testified that in the first

7    several years they didn't really have a lot of clients.  So

8    we're really looking at a smaller period of time.

9         **THE COURT:**  Let me shift the focus back on you for a

10   moment, if you don't mind, back to specific jurisdiction and

11   particularly focused upon Mr. Williams as opposed to PNS.

12        There is a prong, I think we all agree, that whether

13   or not it's reasonable to exercise jurisdiction; and I

14   understand that there's perhaps some shifting of burden and the

15   burden may shift to Mr. Williams on the reasonableness if I've

16   found the first two prongs being satisfied by your

17   presentation.

18        I've received a submission from Mr. Williams that

19   essentially he's kind of a small operator, that he can't afford

20   to come down here, that it wouldn't be fair to haul him into

21   this jurisdiction.  Can I take that into account?  I mean,

22   shouldn't I consider whether or not this individual as opposed

23   to PNS, is it really fair to haul him into this place?

24        **MS. SUTTON:**  I guess my initial response to that,

25   Your Honor, is he should have thought of that when he was doing

1    what he was doing.  Having said that, Ms. Wagner is here

2    representing him.  If he can't afford a hotel room, how does he

3    possibly afford Ms. Wagner's fees?  We offered to go to Seattle

4    to depose him.

5         **THE COURT:**  Well, who knows who's paying those fees.

6    I mean, I'm not --

7         **MS. SUTTON:**  That's exactly, Your Honor.

8         **MR. MOSKO:**  Just a moment, Your Honor.

9              (Counsel conferring.)

10        **MS. SUTTON:**  Oh, I'm sorry.  Sorry.  Mr. Mosko.  I

11   always get the two confused.  Same thing probably.  I imagine

12   their fees are comparable.

13        And you're right, he's probably not paying those

14   fees.  So why is he going to have to pay for his hotel?

15        We offered to go up to Seattle to depose him.  He

16   came down here.  He -- I'm sure he rented a hotel room.  He did

17   it for his deposition.  And we had our tickets booked to go to

18   Seattle and see him.

19        I just think at the last minute they're trying to

20   throw up as many arguments as they can, which we never saw

21   before, by the way, so we didn't have a chance to respond, but

22   I think it's ludicrous.

23        I don't think that's part of the analysis.  He did

24   what he did.  He should expect to be called into court to

25   account for his actions.  If he wants to transfer venue to

1    Washington, he should have raised that.  That's where the money

2    goes, you know, whether it's reasonable for him to be excepted

3    to pay for this.

4              **THE COURT:**  Transfer the venue to Washington of this

5    case?

6              **MS. SUTTON:**  Yes.  If he's going to raise the issue

7    of, "Oh, I can't pay," why didn't he ask the Court to move it

8    up to Washington?

9              **THE COURT:**  Okay.  Mr. Mosko?

10             **MR. MOSKO:**  Thank you, Your Honor.

11             The Court asked the question, I think correctly,

12   about whether these -- the Ninth Circuit cases concerning

13   specific jurisdiction should be read differently when we're

14   dealing with this context; and I would submit to you that there

15   are cases in the Ninth Circuit that have dealt with the cyber

16   world, as we all refer to it, in many instances.  Yet they

17   still go back and they cite the *Bancroft* case, which initially

18   reinterpreted the *Calder* line of cases, the affects case, which

19   said, "In order for the Court to assert jurisdiction, there has

20   to be -- the defendant had to have known where the plaintiff is

21   located."  Those cases have been cited time and time again.

22             **THE COURT:**  In most instances, though, and I look

23   back at those cases, it's not an issue in those cases; and

24   because of the very nature of the case, you are not confronted

25   with a situation we're confronted with where the party against

whom jurisdiction is sought to be invoked says, "I didn't know where they were."

I mean, it just doesn't get -- it's somewhat of an artificial issue because everybody knows.  You know, no one's disputing that the defendant doesn't know where they're located.  So, in a way, yes, it's always discussed in those Ninth Circuit cases, it's addressed, but it's not an issue like it is in our case.

**MR. MOSKO:**  Well, let me, first of all, explain why I think the rationale was --

**THE COURT:**  Okay.

**MR. MOSKO:**  -- presented.  What the *Bancroft* case did, and that's a Ninth Circuit case that's interpreting California, a California jurisdictional issue, what the Ninth Circuit did was it said, "We've looked at *Calder*.  We've looked at the cases that have issued subsequent to *Calder*, and we think that there has to be something more than foreseeability; that is, we think that there has to be a circumstance where the defendant knows that his acts or her acts or its acts will have an effect in the forum."

Now, that's what *Bancroft* did, and there are several more Ninth Circuit cases which have adopted that and have confirmed that that's what's going on in the Ninth Circuit right now.

With respect to this cyber world issue, it's true

that last night the plaintiff submitted these cases to the

Court. What's interesting about that is, the cases they've

presented to us, at least one of them, is not new at all. The

*Verizon versus Ralsky* case came down from the Western

District -- or the Eastern District of Virginia back in 2002.

So to say that they've just learned about this, that

they've just found out about these circumstances that should

change the Ninth Circuit law is inappropriate in my opinion.

It seems to me that if the Ninth Circuit really thought that

this case was really leading to a position or to a circumstance

where it should back off on its claim of or its requirement

that the defendant knew where the plaintiff was located, that

the Ninth Circuit would have said that. Yet there are several

post-2002 cases on specific jurisdiction that have never cited

the *Verizon versus Ralsky* case.

Now, I, of course, have read the *Ralsky* case, and I

found it very interesting that Ms. Sutton pointed you to

page 12 and is talking about the activity of knowing what was

going on or presumably knowing what was going on with respect

to Verizon servers.

The *Ralsky* case, the *Verizon versus Ralsky* case, is

substantially different than what's before this Court. In

*Ralsky* -- and the Court makes a -- the *Ralsky* Court makes a

very, very detailed discussion, provides a detailed discussion

about what an ISP is. Now, what the Court says is that they're

going to essentially make an exception with respect to an ISP

when it comes to jurisdiction, an exception with respect to

circumstances that will establish specific jurisdiction.

Now, the Court goes to some lengths in describing

what an ISP is.  That is not -- if you compare what the Court

says about an ISP in *Ralsky*, Facebook is not an ISP.  An ISP

from *Ralsky*'s perspective is an entity that facilitates

communication.  It's an entity that has involved a number of

servers that receive e-mails and then process those e-mails and

serve them out to all the recipients.  That's not what we have

here.  We don't --

**THE COURT:**  You do, though, have servers in

California that are, according to the allegations by the

plaintiffs, are impacted here.

**MR. MOSKO:**  But there's a big difference between

what these servers do, what Facebook servers do, and the

servers that are involved in *Ralsky*.

So what the Court goes on to say is, with respect to

a spamming effect, what occurs is, somebody sends out some

communication that goes into these servers in the forum.  The

servers then get inundated because there's millions and

millions of e-mails that they have to process, and then they

have to send these e-mails out to all the proposed or the

expected recipients.

Okay.  And what the Court says is, that puts a

tremendous burden on the servers. It puts a tremendous burden on Verizon, the ISP. And, so, in that circumstance when somebody sends out a series of spam e-mails; that is, go -- when they send these e-mails out, they say, "Go to all these different recipients," what's happening with those servers is they are being overburdened, and the Court makes -- provides a very long discussion about how they become overburdened. All the bandwidth that would normally be used to process legitimate e-mails is being taken up; and, so, there's delays and there's all kinds of problems.

THE COURT: Well, so your point is it's not just having an effect, it's that you're having a deleterious effect?

MR. MOSKO: Absolutely.

THE COURT: Well, is that part of specific jurisdiction, that the effects have to be deleterious?

MR. MOSKO: Well, look what *Ralsky* does though. What *Ralsky* comes back and says, "Under that circumstance when you're causing an effect on servers, such as the effects on an ISP, on that circumstance the Court can exercise jurisdiction in the forum where those servers are located."

Okay. Compare what we have in this instance. There was no e-mails. There were no, quote-unquote, spam e-mails that went through any of the Facebook servers.

The allegation against the defendants is that they acquired access to Facebook.com. On Facebook.com there were a

number of e-mail addresses and they took them. Now, those are the allegations; and, then, through a separate set of circumstances they sent out e-mails to those particular e-mail addresses.

Now, that's a far cry from what's going on in *Ralsky*. They did not -- they do not allege, plaintiffs do not allege that the e-mails that they sent out were being sent out through Facebook servers. So when you look at that distinction, what you conclude is, there is no reason to find or to abandon the requirements of the Ninth Circuit in this particular instance, which require that the plaintiffs know -- that the defendants know where plaintiff was located.

This comes back to the more traditional set of circumstances where the plaintiff -- the defendants must have known in the course of their action, and the real action that they're talking about is the taking of the e-mails. They must have known that Facebook was actually located in this jurisdiction; and the evidence, the direct evidence, the testimonial evidence says that they didn't.

**THE COURT:** I have to note that -- and I don't disagree with you that the language of the case law certainly talks in terms of jurisdiction being invoked where the party does know that the particular forum involved is the forum that's the one that's going to assert jurisdiction, but I'm not sure why that should matter.

1    I have to say, that if -- the notion that seems to
2    me that under -- to underscore, to understructure the idea that
3    jurisdiction is having an impact on the forum.  I'm not sure,
4    in other words, why it should be important that a particular
5    party knows that the -- that, say, the party they are targeting
6    is located in a particular place.

7    Because the idea of jurisdiction is, if you had an
8    impact on that place and you've intentionally done that, it's
9    appropriate and fair to reserve jurisdiction.  Why does it
10   matter that you know the particular place is California?

11   **MR. MOSKO:**  Well, and at let me see if I can respond
12   to that, because you have to go back to the initial cases, the
13   earlier cases --

14   **THE COURT:**  Right.

15   **MR. MOSKO:**  -- that talk about due process when it
16   comes to having to answer a Complaint in a forum that you
17   don't -- where you don't live.

18   And, so, the approach has been, the Supreme Court
19   since the beginning of time, when we were all in law school and
20   we were reading *Pennoyer versus Neff* and *International Shoe*,
21   and all those other cases --

22   **THE COURT:**  (Inaudible); right?

23   **MR. MOSKO:**  Exactly.  We're dating ourselves.

24   **THE COURT:**  Right.

25   **MR. MOSKO:**  Those are the cases where the courts

come back and said: We are going to impose a due process requirement. If there is a wrong that's been committed, we're not saying to the plaintiff, we're not going to let you proceed; what we're going to say, and the cases have established the point where they say, we are going to make you proceed in the forum where the defendant is located.

Now, the courts could have gone a different way but they didn't, and these cases have gone all the way up to the Supreme Court and the courts have come down with this structure, with the three-prong structure. And then we've had additional cases that have impacted that three-prong structure, and then we've had the Ninth Circuit that's gone further to impose additional requirements, that being that the plaintiff -- that the defendant has to know that the plaintiff is located in that forum.

And, so, from that perspective, Your Honor, I have to say that if they want to pursue Mr. Williams and they want to pursue Pacific Northwest Software, they have a forum. The forum is Washington state.

**THE COURT:** The additional -- some additional factors they present to me, the targeting if you will, or the retrieval of e-mail addresses of students that are located in California, why shouldn't that be something that I can take into account? Because I don't hear any real dispute that e-mails that are being retrieved, that PNS and Mr. Williams are

1    aware that some of these students are located in California.

2            **MR. MOSKO:**  And, in fact, Mr. Williams and PNS had

3    no such knowledge.

4            And what I'd like to do, I think the Court is

5    assuming a fact --

6            **THE COURT:**  Okay.

7            **MR. MOSKO:**  -- that hasn't been established.

8            In the four inches of paper that were submitted in

9    the opposition, there is only one document that makes reference

10   to e-mail addresses in California, one document where they can

11   point to the fact that an e-mail was sent to California, and

12   that's Exhibit 10 to Mr. Cooper's declaration.

13           **THE COURT:**  That's e-mails being sent to California.

14   How about the fact that they're retrieving addresses that they

15   know are addresses of students who go to UCLA or Stanford or

16   wherever else?

17           **MR. MOSKO:**  It's the same.  I think it's the same

18   argument.

19           **THE COURT:**  All right.

20           **MR. MOSKO:**  Because the argument is, that my clients

21   have retrieved those addresses and then have sent e-mails to

22   those e-mail addressees.

23           **THE COURT:**  To them, all right.  So they're none --

24   so it's not a situation where they were retrieving addresses

25   and they don't do anything with them, all right.

1    **MR. MOSKO:**  I think their argument is, and I think

2    in order to, of course, to make the CAN-SPAM argument, they

3    have to be arguing that we've sent e-mail addresses -- that we

4    sent e-mails to --

5         **THE COURT:**  Okay.

6         **MR. MOSKO:**  -- the addressees, the e-mail addressees

7    represented in what we've taken.

8         If you take a look at Exhibit 10 to Mr. Cooper's

9    declaration, what I'd like to point out is, that while it makes

10   reference to, and I think there's about 500 e-mail addresses

11   here, and I concede that some of those e-mail addresses are --

12   appear to be related to California schools.  There's Stanford

13   in there, for example.  I don't think there is a dispute that

14   Stanford was located in Palo Alto just north of here.

15        But there's nothing, Your Honor, that ties this

16   exhibit, the only exhibit that makes reference to e-mail

17   addresses, to PNS or Mr. Williams.  If you look at it, it's an

18   e-mail address that says, "Subject:  ConnectU from David Tufts,

19   dave@imarc.net."

20        There's no testimony, there's no indication as to

21   who these people are, as to who iMarc is.  There's no

22   indication as to who the recipient is, iMarc Partners at

23   imarc.net; and, more importantly, if you go through this

24   exhibit, there's nothing in here that ties any of these e-mail

25   addresses to any activity alleged to have been performed by PNS

or Mr. Williams.

**THE COURT:** Well, isn't the allegation, though, that PNS and Mr. Williams develop the program that makes it possible to farm -- however, whatever term you want to use -- these e-mail addresses; and that they, having done that, they have an impact on the state; and that they know that their program is going to be used for purposes of pulling out these addresses, and that is certainly predictable that some of the addresses are coming from California schools?

**MR. MOSKO:** I don't think that was what the allegation is; but even if it were, it seems to me, in order to tie Mr. Williams and PNS into this case for the purposes of specific jurisdiction, if you accept the argument, the novel argument, that they don't have to know where Facebook or Mr. Zuckerberg were located, you have to provide at least some evidence that they knew, or it was likely that they knew, that particular e-mail addresses were being sent to California addressees.

There is nothing in this four inches of paper that so provides. There was testimony. They attached a number of documents, a number of scripts; that is, certain portions of scripts. I believe that's Exhibit 19. Actually there's a lot of documents in Exhibit 19. And they actually showed Mr. Williams a couple of those pages. Mr. Williams testified -- there's no testimony at all from Mr. Williams that

he wrote any of that script that specifically grabbed any California e-mail or that specifically sent any e-mail to California.

Now, I realize there is a lot of -- a lot of things in here, and that's why in my reply brief I tried to center the Court's attention on just those key pieces of evidence that could possibly tie PNS and Mr. Williams to California.  There's no testimony, no corroborating testimony, no prima facie evidence that legitimately connects the individual defendants who are moving for dismissal for lack of personal jurisdiction to that particular activity.

And, so -- and even -- frankly, even if you go through this, there's 500.  These are the only 500 that they talk about, right?  There are a handful of California e-mail addresses.

So what they're asking the Court to do with the evidence they've submitted, is to assert jurisdiction, specific jurisdiction, under circumstances where even if you accept the double inferences, that is, that Mr. Williams and PNS had something to do with sending e-mails to California, maybe there's 40 of them, maybe there's 50 of them.  That's a hard argument to accept, that because of sending 50 e-mails to California, that's sufficient basis to assert specific jurisdiction.

**THE COURT:**  Comment for me --

1          **MR. MOSKO:**  Please.

2          **THE COURT:**  -- if you will, on the argument that you

3  make with respect to Mr. Williams and just the general notion

4  that -- of a fairness concept, reasonableness concept, as to

5  whether or not jurisdiction should be exercised.

6          Assuming that I went with Facebook on the first two

7  prongs and you're now in the position of arguing that it's not

8  reasonable to do that, I mean, can I really have the rule

9  that -- let's accept that Mr. Williams is not flush and ready

10  to charter the plane, and all the rest, to come to California.

11  I'll accept all that.  But there isn't a carve-out for, you

12  know, financial wherewithal being sufficient to say, "Well,

13  otherwise it would be appropriate to assert jurisdiction; but,

14  you know, you've got financial problems, so we won't bother

15  them."  I mean, I can't adopt that concept.

16          **MR. MOSKO:**  You know, the Supreme Court -- this is

17  the third prong of special jurisdiction; right?

18          **THE COURT:**  Right.

19          **MR. MOSKO:**  They go through these first two prongs

20  and they say, "Okay.  There has to be substantial contacts.

21  The claim that is being asserted has to be directly related to

22  the forum contacts."

23          Then the Court has identified seven different

24  factors --

25          **THE COURT:**  Right.

1          **MR. MOSKO:** -- for the purpose of reasonableness.

2          I have to say this is a very unique case in the

3    scenario, because these people, Mr. Williams and the folks

4    related to Pacific Northwest Software, are in the middle of a

5    battle that they don't belong.  This is a battle between

6    Facebook and ConnectU, and I guess we'll talk about that at the

7    Case Management Conference a little bit more; but I think we've

8    presented some documents about what's going on in the District

9    of Massachusetts with respect to the claims that ConnectU is

10   making against them.

11         These people are in the middle of this battle that

12   they don't belong and they're really, really being pressed.

13   Mr. Williams here is an individual.  He's a journeyman -- if I

14   can use that phrase because that's the way PNS used that

15   phrase -- contractor.  He's a guy that, you know, smart as the

16   dickens but, by gosh, doesn't make a whole heck of a lot of

17   money and can't afford to come down here.

18         If this Court compels jurisdiction over

19   Mr. Williams, he won't be here.  This is a situation where his

20   due process rights, which is specifically discussed in the

21   cases that I've cited in my opposition -- in my reply,

22   particularly the *Caruth* case, this is a specific special

23   circumstance where he won't be able to pay the money to fly

24   down here or pay the money to even rent a hotel.

25         **THE COURT:**  Does that come within one of these seven

factors?  I mean, we don't have a financial wherewithal prong
to jurisdiction; do we?

      **MR. MOSKO:**  Well, respectfully, I think it does.

      **THE COURT:**  Okay.

      **MR. MOSKO:**  Because the second prong says the burden
on defendants of litigating in California.

      **THE COURT:**  Well --

      **MR. MOSKO:**  Now --

      **THE COURT:**  -- that's not exactly saying, "Do you
have enough money to do it?"  I mean, I think the burden is --
that burden analysis, one can interpret that as being the
burden that you would have regardless of your financial
situation.

      I am troubled, obviously, by the notion that the
jurisdictional rules don't -- you know, you have one instance
where you assert jurisdiction because somebody is financially
better off than someone else.  I mean, that cannot be the rule.

      **MR. MOSKO:**  Well, in this instance I think the
reason why the court put that in there, why they come up with
these seven factors and said the burden is on the defendants,
because it really needed to look at -- the Court really needs
to examine what the effect is.

      Now, the cases that have talked about burden, do
actually talk about the money issues; and the cases that have
evaluated said, "Well, sure it's hard but you can make it.

Maybe you can go out and get a loan or whatever."  Mr. Williams

is not in that condition.  He doesn't have his own business

such that he can go borrow money.  He is -- literally he's a

destitute individual that lives hand-to-mouth, lives in his

parents' house, as I understand it.

And, so, under that circumstances -- under those

circumstances, the courts say, "What is fair?  What is the

burden?"  This is one factor in seven; but I have to say in the

near 30 years that I've been litigating and handling issues

like this, this is the first time that's come across -- I've

come across a situation where I've got a client here who simply

can't afford to pay the money to come down here.

And under those circumstances, particularly given

when you compare them to the other six or seven that the Court

has said, I think that this is one of those that just has to

trump, if the Court gets to this prong, and I would submit that

the Court should not get to the prong --

**THE COURT:**  I understand.

**MR. MOSKO:**  -- because we're -- the first should

result in dismissal.

**THE COURT:**  The additional supplemental materials,

you made the argument that *Ralsky* is nothing new and you knew

about it any way.  Do you want to -- do you want leave to file

something to respond to the supplemental materials?  I'll be

honest with you, I haven't seen the supplemental submission.  I

1 didn't know that they had come in.  Do you want to file

2 something?  You don't have to, but I will give you leave to do

3 it.

4     **MR. MOSKO:**  Let me make the observation.  First of

5 all, the supplemental materials, the plaintiffs should have

6 known about these; and under the Local Rules, I think Local

7 Rule 7-3 allows you to do this but only under the circumstances

8 where the information -- the case comes down is new.  That is,

9 you file the opposition and a week or two later --

10     **THE COURT:**  Right.

11     **MR. MOSKO:**  -- some Court comes down and says --

12     **THE COURT:**  Right.

13     **MR. MOSKO:**  If the Court is going to consider these

14 documents, going to consider this law, then I would like the

15 opportunity to more fully review them.  I've looked at them

16 last night --

17     **THE COURT:**  Right.

18     **MR. MOSKO:**  -- and I've prepared last night.

19     **THE COURT:**  Right.

20     **MR. MOSKO:**  But I would like the opportunity to

21 submit --

22     **THE COURT:**  Okay.

23     **MR. MOSKO:**  -- at least a two- or three- or

24 four-page evaluation, if the Court considers it --

25     **THE COURT:**  Does the supplemental submission have

argument or was it just case authority?

MR. MOSKO:  Just the two cases.

THE COURT:  Well, what I would be inclined to do is allow you to submit any other authorities for me.  I mean, I understand your argument that the rule provides that it should be something that you wouldn't otherwise have known.  At the same time, I'm not going to hamper my ability --

MR. MOSKO:  Right.

THE COURT:  -- to do a full analysis of the issues by saying their case is -- hat arguably you're persuasive and I'm not going to read because they -- I'm not going to consider them.  I don't think that's the right thing to do.  So --

MR. MOSKO:  Your Honor, that's fair enough.  I looked at them last night.  I've come up with my evaluation.  I think my evaluation is accurate; but having just had a few hours to do that, there may be something in addition I would like to say about them --

THE COURT:  Right.

MR. MOSKO:  -- given the short period of time between when they were submitted and this morning's argument.

THE COURT:  All right.  What I will do is, by the end of next week if either side -- confined to these authorities that were just submitted to me in the supplemental submission -- if either side has anything further they want to say about these authorities or if Mr. Mosko has some additional

ones he wants to present to me, you get two pages. Each side
can point out, highlight to me anything they think I need to
consider with respect only to those additional new authorities.

And I'm not asking -- don't feel you're compelled to
do that. If you want to rest on what you've given me, that's
fine. If, Mr. Mosko, you take a look at the authorities and
say, "I've already argued my points. I don't really want to
argue anything further," neither party is required to submit
anything further to me; but if you want to submit something
further, it's got to be a week from today and it's no more than
two pages, and it can be in the form of a letter.

**MR. MOSKO:** Perfect.

**THE COURT:** Okay.

**MR. MOSKO:** Thank you. I understand. I appreciate
it.

**THE COURT:** Okay. Anything? Any further
discussion? Go ahead. Ms. Sutton?

**MS. SUTTON:** Mr. Mosko is taking you back to
*Pennoyer v. Neff* for due process discussions, and I would like
to point out that things have changed. We're now in the
Internet world and things are a little bit different.

Having said that, even as early as 1985 with the
*Burger King* case, the Supreme Court said jurisdiction is proper
where the contacts proximately result from the actions by the
defendant himself that create a substantial connection with the

forum state. So long as the connection is substantial, even a single act can support jurisdiction.

His notion that maybe there were at most 40 e-mail addresses from California, not enough. I don't think that's the law.

There are two things going on here, he's correct. One is, they hacked into our Web site, they stole data, and then they spammed us. It sounds like three, but it's really two. They hacked in and stole things and then they spammed us.

We think specific jurisdiction is appropriate in both instances, and we think that *Ralsky* is instructive on what -- on how the Court should deal with it; and I believe --

**THE COURT:** Well, why didn't I get that case before? I mean, he's right that the Local Rule does provide for -- I think the notion of the Local Rule is something that happens in the interim gets presented to me. Why wasn't this case, if it was so important, contained in the materials I got?

**MS. SUTTON:** Because in their opening brief they never mentioned anything. It was a 10-page brief that basically said, "We're not responsible because somebody else told us to do it and we were acting on somebody else's behalf." End of story. They never raised the issue. They didn't raise a knowledge issue until their reply.

**THE COURT:** Okay. Okay.

**MS. SUTTON:** It just came up for us. And we never

said we just learned about the *Verizon* case as in it was just

issued. We just learned about it --

    **THE COURT:** Right. I think everybody knew what

the -- where the battle would be joined in this case, but okay.

Go ahead. Go ahead.

    **MS. SUTTON:** So I think in terms of due process, the

analysis really is: Did you purposefully direct your

activities towards the forum residence even? If you read

*Calder*, it doesn't say you have to know where the state is.

You have to be intentionally targeting that resident.

    By the way, he happens to be in California. What

*Ralsky* says -- and, by the way, I believe Mr. Mosko says

there's no Ninth Circuit law on this. There's a Western

District of Washington case that adopts *Ralsky* and agrees with

it and it says it rejects the notion that you can act in the

Internet world and totally ignore or plead ignorance that you

don't know where you're acting.

    *Ralsky* is not limited to ISPs and attacks on their

servers. In fact, *Ralsky* has -- adopts Ninth Circuit law,

talks about *Calder*, and all these other cases we're discussing

today, and specifically applies those cases. In fact, when I

spoke earlier, I went through the *Calder* elements, which the

*Ralsky* case does. So it absolutely applies Ninth Circuit law

in that instance.

    **THE COURT:** Mr. Mosko points out that, and, again, I

haven't gone through the *Ralsky* case, but he thinks there's a distinction that the *Ralsky* case involved servers that were attacked and harmed, impacted negatively; and in this instance the Facebook servers, if you will, are -- material is taken from them, but there's no overtaxing of the server process, there's no -- the ISP is not impacted in the way that's impacted in *Ralsky*.  Is that a distinction you think of consequence?

            **MS. SUTTON:**  No, I don't, Your Honor.  In fact *Ralsky* does talk about the impact on the servers for Verizon but the overall case is about:  Did they purposely avail themselves of the forum state?

            Here the notion that they didn't cause harm to our servers is absurd.  They hacked into our servers repeatedly.  Facebook repeatedly put up blocks to stop them from doing it.  Damage one.  They had to expend resources to keep these people out.  They continued to play cat and mouse.  Mr. Chang said --

            **THE COURT:**  Well, more fundamentally, do you think that there is a requirement when you're doing a specific jurisdiction analysis that there has to be -- is it affects or is it harm?

            **MS. SUTTON:**  It's affects, Your Honor.  It's called the affects test.  If you read *Calder* and you read *Schwarzenegger*, they say you're specifically targeting this plaintiff.

That plaintiff, you take that plaintiff where he is, especially in the Internet world. Can they really stand here and say under CAN-SPAM that every time somebody sends out spam e-mail, they have to know where that spam is going? It's illegal just to do it, the fact that they specifically put in the e-mail addresses, deliberately put in the commercial e-mail, and sent it.

And, as you know, if you looked at the code, they specifically targeted Facebook. They specifically targeted other California companies. For them to stand back and say, "Yeah, but we didn't know Facebook was in California," a, I don't believe it, and I don't think they get to trump our allegation that they did know Facebook.

**THE COURT:** Well, where's your evidence though? I mean, all I have before me is some testimony that says, "We thought it was Massachusetts," and I have an argument from you that, "We don't believe them." Well, your "I don't believe them" is not evidence rebutting that. What's the evidence?

**MS. SUTTON:** I don't think we have to provide complete evidence, Your Honor. The standard is --

**THE COURT:** That's a different question. My question is -- and I'm not saying that it's -- I'm necessarily indicating this is the critical element, but right now the record I have before me, there is nothing that directly rebuts, and point to it if there is such a thing, that directly rebuts

1    the testimony of PNS/Williams that they did not know that

2    Facebook was located in California?  If there's something -- I

3    mean, I know you're saying, "We don't believe them."  Okay.

4    But on that point, if that were critical for me, I don't have

5    any evidence rebutting that; do I?

6            **MS. SUTTON:**  How do you -- I mean, how do you prove

7    that when they sit there and say that?  Well, we do --

8            **THE COURT:**  Well, a lot of ways.  You could have all

9    sorts of people saying, "They told me they knew they were in

10   California."  You can have documents.  You could have a host of

11   things that would reflect that that is an untrue statement.

12           My only point is, to the extent that you want me to

13   say I should disregard that, I want to know why you think I can

14   disregard it if, in fact, that is a factor which I deem to be

15   important, because I don't think there's anything in the record

16   that is contrary to their statements that they thought

17   Massachusetts was where Facebook was located.

18           **MS. SUTTON:**  Well, one thing that is in the record,

19   Your Honor, is a couple of news articles that specifically talk

20   about Facebook and where they're located.

21           **THE COURT:**  Is it in the testimony that they read

22   them?

23           **MS. SUTTON:**  No.

24           **THE COURT:**  Well, then, okay.

25           **MS. SUTTON:**  You're right, Your Honor, we don't have

1    anything specifically in here; but I don't think at the end of

2    the day, after we have shown what deliberate actions they've

3    taken specifically targeting Facebook --

4             THE COURT:  Oh, I think you're right.  I think it's

5    a different point, and I understand that.  I just wanted to get

6    an understanding.  I wanted to make sure I hadn't missed

7    something.  On the point where you said, "Don't believe them,

8    Judge," I wanted to know why you said that.

9             It may well be I may conclude it's not important any

10   way.  You know, I understand your argument is not simply that,

11   a dispositive issue is whether or not I believe that they know

12   it was California.  You're saying it doesn't matter --

13            MS. SUTTON:  I'm saying both --

14            THE COURT:  -- if they thought it was Massachusetts

15   or California.  Well, the both is where I have a problem

16   because if you're arguing also that I should disbelieve them, I

17   want to know why you think there's something that I could base

18   that conclusion on because there's nothing in the record other

19   than their testimony.

20            MS. SUTTON:  We have an allegation in the Complaint

21   that says --

22            THE COURT:  Allegations in Complaints are

23   allegations.  In fact they should be supported by facts.  What

24   are the facts?  What supports the allegation that they didn't

25   think that Facebook was located in Massachusetts?

1          **MS. SUTTON:**  At the time they attacked our servers,

2     Your Honor, Facebook was huge.  It was hugely poplar.

3          **THE COURT:**  Well, I mean, that's -- if that's your

4     argument, that's -- I think that argument is one I would be

5     careful making because I can't simply assume that everybody in

6     the world knows about Facebook.  So in the fact that there may

7     be press, and the like, I don't think that rebuts their

8     testimony.

9          It may well be that you can prove to me ultimately,

10    if it's important, that they didn't know or that they

11    misrepresented or whatever, but right now there's nothing there

12    that indicates to me that they weren't being truthful and

13    honest that they didn't know where Facebook was located.

14         **MS. SUTTON:**  Okay.  The Court said we could have

15    taken discovery.  I don't know.  We were here a couple months

16    ago asking to take expedited discovery.  We had asked to take

17    discovery of several people on personal jurisdiction.  We

18    weren't able to take all the discovery we think that would have

19    borne this out actually.

20         But I think that, technically speaking, the fact

21    that they knew our IP addresses in able to -- in order to

22    attack our servers gave some indication of where the servers

23    were located.  I don't have any expert testimony to say that,

24    but at this point the standard is that we provide you facts

25    that if true and support jurisdiction, then jurisdiction is

1    proper.

2            **THE COURT:**  Yes.  But I think you should -- I would

3    be careful relying upon the argument that they knew California

4    was where Facebook was located if all you have is a sense that

5    you don't trust these people.  Because that is not evidence;

6    and, so, you know, I would just -- I wouldn't make that

7    argument if there isn't something more to support it, so...

8            **MS. SUTTON:**  Fair enough.

9            **THE COURT:**  Okay.  Go ahead.  Anything further?

10           **MS. SUTTON:**  Well, I was going to say that I think

11   it doesn't matter anyways, Your Honor.

12           **THE COURT:**  I understand that point.

13           **MS. SUTTON:**  Okay.  I just want to make sure I've

14   addressed everything that he raised quickly.

15                       (Pause in proceedings.)

16           **MS. SUTTON:**  In terms of Mr. Williams' financial

17   condition --

18           **THE COURT:**  Right.

19           **MS. SUTTON:**  -- I don't think it's relevant and we

20   can, obviously in this Internet world, set up a video

21   conference, if that's really the concern.  There are ways to

22   work around whether or not he can afford to actually fly down

23   here despite the fact I don't think that he's really paying for

24   that.

25           And if I can --

1    **THE COURT:** Well, I interpreted Mr. Mosko's

2 arguments a little bit differently I think, and I don't want to

3 put words into his mouth, that when you're looking at the

4 overall case, that it is appropriate to do some balancing that

5 on the one hand there are allegations against a particular

6 person.  If it's IBM as opposed to a single actor, isn't it all

7 right, isn't it permissible to consider the degree of their

8 involvement versus the burden on having them answer in a

9 particular forum?

10    **MS. SUTTON:** Right.  And if we're looking at the

11 degree of his involvement, he wrote this program.

12    **THE COURT:** Right.  I understand.

13    **MS. SUTTON:** So I think that far outweighs his

14 complaint that he can't afford to fly down here.

15    **THE COURT:** Okay.

16    **MS. SUTTON:** And PNS themselves point to Williams

17 whenever -- we've disposed them twice and asked about this

18 importer program.  They always say Winston Williams wrote the

19 program.  They're pointing to Winston Williams.  ConnectU is

20 pointing to Winston Williams.  He was, according to everyone

21 else, the main guy.

22    **THE COURT:** Okay.  Before I move on to the case

23 management conference, anything further anyone needs to say?

24    **MS. SUTTON:** If I could, Your Honor.  I'm sorry.

25    **THE COURT:** Okay.  You get one more go-around.  Go

1    ahead.

2           **MS. SUTTON:**  Just on the *Ralsky* case, which I

3    mentioned applies Ninth Circuit law, but also discusses another

4    case out of the District of Mississippi; and what that case

5    says is:  (reading)

6                    "By sending an e-mail solicitation to the

7                    far reaches of the earth for pecuniary gain, one

8                    does so at her own peril and cannot then claim

9                    that it is not reasonably foreseeable that she

10                   will be hailed into court in a distant

11                   jurisdiction to answer for the ramifications of

12                   that solicitation."

13          That goes back to *Burger King*.  It needs to be

14   reasonable.  It cannot be based on random, fortuitous, or

15   attenuated contacts; but, as we've established in our

16   opposition, they have deliberately and repeatedly attacked our

17   servers, stolen information, and spammed our users.  They

18   directed their activities here and should be called to account

19   for them.

20          **THE COURT:**  Okay.  Mr. Mosko, one last comment?

21          **MR. MOSKO:**  I have two short points, one concerning

22   the comment about pecuniary gain.

23          Your Honor, this is not a circumstance where the

24   sending of e-mails from ConnectU to the Facebook registrants

25   resulted in any kind of pecuniary gain.  This is not a

1    circumstance where we were trying to advertise, where we were

2    trying to get money from them, or we were trying to say, "Hey,

3    go buy our goods or come buy our services."  That is not what

4    was going on here.

5              So if Ms. Sutton and Facebook is relying on the fact

6    that specific jurisdiction should be exercised because we

7    specifically entered into some forum with the purpose of

8    gaining some kind of pecuniary benefits, there's no evidence of

9    that; and, in fact --

10             THE COURT:  Well, isn't the pecuniary benefit in the

11   form of obtaining this information, using it; and then once you

12   use the information, you sign up customers and make money?

13             MR. MOSKO:  It doesn't cost a cent for anybody to

14   sign up for Facebook.  It doesn't cost a cent.

15             THE COURT:  Well, it's a bit more subtle than that,

16   but the business model ultimately is for gain.  It depends upon

17   obtaining the building blocks, which are the e-mail addresses.

18             MR. MOSKO:  You know, that is a leap of faith --

19             THE COURT:  Or is the a Napster situation where

20   you --

21             MR. MOSKO:  -- because -- and the reason for that

22   is, these were three individuals out of Harvard University in

23   their junior and senior years.  They weren't thinking about

24   this is -- they weren't thinking about how much money can I

25   make or can I make money.

1    When you look at the cases, particularly the *Verizon*

2    case and this other Western District of Washington case that

3    they cite, that's a situation where the spammer -- if I can use

4    that phrase -- is going into these servers, sending e-mails for

5    the specific purpose and benefit, for the specific purpose of

6    sending advertisements so people will buy their products, will

7    buy their widgets.  That's not what we have here.  There's a

8    distinction.

9    The other comment that I would just like to make,

10   and this goes back to the issue of when you were talking with

11   Ms. Sutton about knowledge of -- whether PNS' and Winston

12   Williams' knowledge that Facebook was located in California.  I

13   found it interesting that if you look at Exhibit 4 to

14   Mr. Cooper's declaration, that is a -- to the extent that it's

15   readable, it's very hard to read, but if I understand it

16   correctly, it is a contract between Facebook and a company

17   called Equinex for the purpose of renting server space.  Take a

18   look at page 19.  You'll see that Mr. Zuckerberg, the now

19   plaintiff and then CEO, signs his name CEO.  Mailing address

20   shows an East Coast mailing address.

21   So to the extent that they are saying, "Gee,

22   everybody should know Facebook is located in California," I

23   don't think you should accept that.  It didn't sound like you

24   were going to accept that in your responses to Ms. Sutton, but

25   I'd just like to add that one piece of evidence to the list.  I

1   mentioned that in my reply brief, but this is a circumstance

2   where they just jumped across the country and opened up.  And,

3   so, how they can then assert we should be subject to

4   jurisdiction because they made that quick jump is, I think,

5   inappropriate.

6           With that I'm going to submit.

7           **THE COURT:**  Okay.  Case management or --

8           **MR. CHATTERJEE:**  Your Honor, I asked Ms. Sutton --

9           **THE COURT:**  Okay.

10          **MR. CHATTERJEE:**  -- if I could address one point

11  Mr. Mosko raised.

12          **THE COURT:**  Go ahead.

13          **MR. CHATTERJEE:**  I am stunned, to be honest.  For

14  Mr. Mosko to come in here and say that the founders of ConnectU

15  didn't do what they did for pecuniary gain is patently absurd.

16  It was a commercial enterprise.  They were trying to steal an

17  opportunity because they felt like Mark Zuckerberg stole

18  theirs.  Period.

19          They have said repeatedly the objective of ConnectU

20  was a commercial enterprise, and they're taking acquisition in

21  Massachusetts today and asking for three quarters of the

22  ownership share of Facebook.

23          **THE COURT:**  Is this issue of particular consequence

24  in the jurisdictional question I'm addressing to begin with?  I

25  mean, I'm not sure why we're arguing as to whether or not

ConnectU is for profit or not. I mean, again, going back to the affects test, if they were -- if it's a not-for-profit enterprise, I'm not sure that would make any difference.

MR. CHATTERJEE: I think it is relevant to the extent that Mr. Mosko was trying to draw a distinction between the case Ms. Sutton cited --

THE COURT: All right.

MR. CHATTERJEE: -- where it was talking about spamming people for pecuniary gain.

THE COURT: Right. But you're not taking the position that pecuniary gain is essential; are you?

MR. CHATTERJEE: I don't think it is.

THE COURT: All right.

MR. CHATTERJEE: But the position that they're not in it for money is absurd.

THE COURT: Well, okay.

All right. Let's talk about the Case Management Conference. So whoever wants to do that can come on up.

MR. MOSKO: Well, I'm here. Can I start?

THE COURT: Well, let me get those who want to participate to come up before you start.

I actually will start --

MR. MOSKO: Okay.

THE COURT: -- and just comment that it's more just a note of despair rather than something that you can act upon.

1    I mean, it is distressing when you read the Case

2    Management Conference Statement.  It's done consistent with the

3    rules, so I have no complaint about it on that score; but there

4    is just no agreement on anything at all, and that doesn't bode

5    well for the future.

6        And I can't think of one I've seen that has even

7    points that usually are ones that aren't particularly

8    controversial.  Even the ground rules for going into an ADR

9    process are the subject of disagreement, which is, you know, as

10   I say, cause for concern.  I'm not sure what I'd do with it,

11   but I just thought I would comment upon it.

12       Okay.  So you expressed a desire to start.  Go

13   ahead, Mr. Mosko.

14       **MR. MOSKO:**  Thank you, Your Honor.

15       This case cries out for the Court to exercise some

16   restraint on the parties, and your observation is exactly

17   correct.  I referenced before when we were talking about the

18   motion to dismiss about reference to the District of

19   Massachusetts case, and this is my opportunity.

20       Facebook is litigating these issues on the East

21   Coast.

22       **THE COURT:**  The case you brought?

23       **MR. MOSKO:**  Yes.

24       **THE COURT:**  Yes.

25       **MR. MOSKO:**  No.  No.  No.  The case -- this case,

1    the case of stealing e-mails on the East Coast.

2            THE COURT:  No, but the case -- just so I'm clear --

3    the District of Massachusetts case was a case initiated by

4    ConnectU?

5            MR. MOSKO:  Yes, that's correct.  Correct.

6            THE COURT:  Yes.  Okay.

7            MR. MOSKO:  So the circumstances -- the Winklevoss

8    brothers and Divya Narendra came up with this idea.  They then

9    retained Mr. Zuckerberg for the purposes of completing the

10   source code.  Mr. Zuckerberg said, "Yes, I'll do it," kept

11   promising them, "Yes, I'll get it done"; and eventually he went

12   AOL [sic].  Nobody heard from him.  And then eventually a

13   couple months later he takes the -- he takes the Facebook.com,

14   registers it, and then a few weeks after he registers it,

15   launches the site.  So we've sued in Massachusetts for that

16   underlying issue.

17           Okay.  Now, when I say that they're raising the

18   issue of the stealing of the California -- stealing of the

19   e-mail addresses in the Massachusetts case, what I would like

20   to do, if I could, is just hand you a few papers.

21           THE COURT:  Well, first tell me what they are and

22   make sure Mr. Chatterjee has seen them.

23           MR. MOSKO:  Sure.  I'm going to give them.  Yeah,

24   he's seen them, I can assure you.

25           THE COURT:  What are they?  What are you handing me?

1    **MR. CHATTERJEE:**  I would like to know what they are.

2    **MR. MOSKO:**  Sure.

3    **THE COURT:**  Yeah.  I want to know before I look at

4    it.  Go ahead.

5    **MR. MOSKO:**  I will be happy to do that.

6    One is Facebook responses to interrogatories in the

7    Massachusetts case.

8    **THE COURT:**  Why should I be looking at these?

9    **MR. MOSKO:**  Because when you look at one of the

10   responses to interrogatories, you'll find exactly the same

11   language that's found in this Complaint, and my point is

12   they're litigating the issues on the East Coast.

13   **THE COURT:**  Well, Mr. Mosko, wait a minute.

14   **MR. MOSKO:**  Yes, please.

15   **THE COURT:**  If you're, as you kind of alluded to in

16   the Case Management Conference Statement, if you're asking for

17   something like a stay, then make a motion.  I'm not going to do

18   that in a Case Management Conference --

19   **MR. MOSKO:**  I appreciate that.

20   **THE COURT:**  -- for many reasons, one of which is, in

21   a Case Management Conference it is a bit more free form and

22   things will flow.

23   And I'll take a look at this; but if I'm going to do

24   something like issue a stay, if that's what you want me to do,

25   I'm only going to do it when both sides have had an opportunity

1    to brief the issue and I've considered it, and all that.  I'm

2    not going to do it on the fly.  So, I'll look at that, but I'm

3    not giving you something like a stay in a Case Management

4    Conference.

5            **MR. MOSKO:**  I didn't expect that the Court would do

6    that.

7            **THE COURT:**  Okay.

8            **MR. MOSKO:**  But the reason why I did -- the reason

9    why I'm raising it now is that I expect that at this juncture

10   the Court is going to say, "Okay.  Here's the way I want to do

11   discovery.  Here's the way I want this case to proceed."

12            And what I'm suggesting to the Court is, what's

13   going on here is they get information on the East Coast.  Then

14   they get the same -- then they take discovery on the East Coast

15   and come back here on the West Coast and take the same

16   discovery.  It's dual.  They've raised the same issues on both

17   coasts, and what I'm --

18            **THE COURT:**  We see that in patent litigation all the

19   time.

20            **MR. MOSKO:**  What I'm asking for -- that's fine, but

21   what we've got here is a circumstance where this is really

22   Facebook versus ConnectU, and then they brought in all these

23   other parties who are really in the middle of this.

24            And what I'd like to suggest is some kind of

25   restraint with respect to these other parties at least until we

1    get them out of the case or at least until the Court decides

2    whether they are going to be in the case.

3        And, so, I've got, and I appreciate where the Court

4    is going and I'll stop, but I've got countless examples.  Even

5    Mr. Chatterjee himself in a recent Case Management Conference

6    on the East Coast said, "We've got stuff that was learned in

7    California, that was learned in Boston, that we're now going to

8    change and do stuff in California as a result of."  So there's

9    all kinds of issues where dual activities are going on, and

10   I'm --

11       **THE COURT:**  I'm not sure that just the dual

12   activities in and of themselves is a problem.  The question is:

13   Indeed, in many instances discovery in one case the parties

14   agree is used in the other case.  I mean, I'm not sure what

15   you're getting at in terms -- I understand what you're saying,

16   that we need to have some clear picture of who the players are,

17   and the like, before people are subjected to the expense and

18   the burden of discovery.  I don't have a problem with that.

19       I guess I don't quite understand why -- the fact

20   that they're some dual -- there is some overlapping litigation

21   which then results in some overlapping discovery.  In and of

22   itself, that's not a particular novel situation.  So I'm not

23   sure what I'm supposed to do with that.

24       **MR. MOSKO:**  Not novel other than the fact that it's

25   happening on a constant basis; and when I raise it here at the

Case Management Conference, I'm pleading for some level of

restraint either exercised by both parties or imposed by the

Court, and that's what I would like to see.

**THE COURT:** Okay.

**MR. MOSKO:** There's been depositions that really

cover both issues on -- it's really costly on behalf of all

parties, particularly on behalf of the defendants who certainly

are not as rich as ConnectU -- as Facebook.

**MR. CHATTERJEE:** Your Honor, if I could respond.

**THE COURT:** Go ahead, Mr. Chatterjee.

**MR. CHATTERJEE:** Finnegan Henderson is counsel in

the case in Massachusetts. Finnegan Henderson is counsel in

the case here. Mr. Mosko has told me repeatedly that he

doesn't know anything that's going on in the Massachusetts case

and doesn't really know any of the details and doesn't talk to

any of his partners about what's happening there.

And now he's coming into court and saying that, I

guess, ConnectU's decision to not have the same law firm people

talk to each other, that they don't want to try and coordinate

things.

I acknowledged in Massachusetts that there is

overlapping discovery and there are somethings that bear

relationship between the two, and we have no problem in trying

to do a coordinated approach.

The problem is, is Mr. Mosko wants to be the sole

1    practitioner here defending all the defendants while they have

2    somewhere between -- the smallest number I've seen is three,

3    I've seen as many as seven lawyers on the plaintiffs' side of

4    the case that ConnectU has in Massachusetts.

5          So if they want to make a strategic decision to

6    leave Mr. Mosko here all alone in the dark not knowing anything

7    about what's happening in the case where they staffed up where

8    they feel it serves their interests, I don't think that's a

9    problem Facebook should have to bear.

10          Our team is integrated.  If you look at the people

11   who are participating in the case here, it's the exact same

12   team that you're going to see in Massachusetts, and there's a

13   reason for that.  It's because there is a coordination that has

14   to happen.

15           iMarc, the company you heard about in the motion to

16   dismiss, it is a central figure in both cases.  Why?  When they

17   decided to hack our Web site iMarc told them, "We think this is

18   unlawful behavior, they told them that, "and we're not going to

19   do it."

20          In addition, iMarc was told, as it relates to the

21   Facebook case -- or the ConnectU case in Massachusetts, they

22   said the Facebook site doesn't look like anything ConnectU,

23   previously known as Harvard Connection, ever did.  The

24   instructions we were given was to copy Facebook.  It's directly

25   relevant to their trade secret idea theft claims there.

1    There is going to have to be a coordination because
2 the document production from iMarc is going to overlap because
3 there's kind of a set of things that the ConnectU founders put
4 in place that are all kind of intermingled.

5    But I don't see a problem with doing coordinated
6 discovery.  In fact, I've included Mr. Mosko on many of my
7 discovery coordination e-mails with Mr. Hornick, who's the lead
8 counsel in Massachusetts.

9    **THE COURT:**  Well, isn't part of the answer to the
10 problems associated with this concern about dual, duplicative
11 perhaps, discovery efforts, and the like, is to coordinate it?
12 I mean, what is the problem with that?  That's what I don't
13 quite understand.

14    **MR. MOSKO:**  Mr. Chatterjee, as friendly as we are
15 with one another, we are pretty good combatants, and the fact
16 of the matter is, what he says is not what's happened.  They
17 noticed the other day, they just noticed iMarc's deposition in
18 the California case only.

19    **THE COURT:**  Well, I mean, so --

20    **MR. MOSKO:**  So it's very simply because --

21    **THE COURT:**  Wait.  Wait.  Wait.

22    **MR. MOSKO:**  Sorry.

23    **THE COURT:**  Where it gets noticed is a process issue
24 to some extent, but why can't the parties work together in some
25 agreement that discovery that's taken in one case can be used

1   in another case?  I mean, what is it about this case that is so

2   problematic that that can't be done?  I mean, I don't

3   understand.

4         **MR. MOSKO:**  That agreement had actually -- has

5   already been reached between me and Mr. Chatterjee --

6         **THE COURT:**  Well, then what's the problem?

7         **MR. MOSKO:**  -- that everything that is produced is

8   the same.

9         The problem that I have is that when they take

10   depositions in the Massachusetts, they raise issues that are

11   related only to the California case; and then they came back

12   and they say, "Well, yeah, okay.  We've got all that stuff in

13   Massachusetts.  Now we're going to take the same guy's

14   deposition in California and ask the same questions."  It's

15   absolutely duplicative.

16         **THE COURT:**  Well, if it's --

17         **MR. CHATTERJEE:**  Your Honor, I'm sorry.

18         **THE COURT:**  Then the answer is, then, to seek

19   some -- if you think that there is -- you know, it's being done

20   for an improper purpose, harassment, or the like, you can seek

21   a protective order.  But I'm not sure how what management --

22   what you're asking me to do, other than -- if you're asking me

23   to stay, I'll consider it as a separate motion and we'll

24   consider it.

25         But, otherwise, I'm not sure what you're asking me

1    to do.  If you're asking to have one case take the lead over

2    the other, my reaction is it ought to be coordinated discovery.

3    If I don't decide to stay the case and if I have the request, I

4    mean, I don't even have the request to do that formally, but if

5    the request is formally made, either the case then gets stayed;

6    or if it doesn't get stayed, my expectation would be that this

7    would be coordinated discovery.

8            And I don't see a circumstance in which I would say,

9    "The case isn't going to be stayed; but, you know, discovery

10   will go separately and apart and you can't ask a question in

11   one -- if you notice a deposition in the Massachusetts case,

12   you can't ask a question there that has overlap in the

13   California case."  I mean, that has no -- that is unworkable in

14   my mind.

15           So I don't get really what the request is.  Maybe

16   you can enlighten me on -- if you could write me, "Judge,

17   please issue this order," what is it?

18           **MR. MOSKO:**  That duplicative discovery in both

19   coasts not occur; that is, if it's going to be separate, if the

20   claim about stealing e-mails is going to be a separate claim,

21   they've decided to bring it separately here in California,

22   despite the fact that they could have counterclaimed in the

23   Massachusetts case, then let's deal with that on this coast and

24   let's deal with the stealing of the Web site issue on the East

25   Coast.

1    **THE COURT:** But doesn't that approach mean you can

2  have two depositions instead of one?

3    **MR. MOSKO:** If that's what it means, that's fine;

4  but let's not have it so that you get to depose the same people

5  in Washington -- the same people on the East Coast, ask the

6  same questions as it concerns the other case, and then come

7  back to the West Coast and do the same thing. That's my

8  concern.

9    **THE COURT:** Well, I think the best answer is, you

10  know, you're talking about Mr. Smith, you take his deposition

11  once and you ask him every question in the Massachusetts case

12  and the California case and be done with him. And I understand

13  that if different lawyers are handling it, then it gets

14  complicated as to all of that, but I suppose -- I'll tell you

15  my reaction is, I don't see why this is so complicated. I

16  mean, we all have cases all the time that are going forward in

17  different forum and somehow parties manage to work out some

18  protocol as to how to do the discovery; and why it can't happen

19  here, I don't get it.

20    But let me step back for a moment on this. This

21  actually is directed more to Mr. Chatterjee, and then I'll --

22  I'm not -- I know you're standing here. I haven't -- I know

23  you're there.

24    **MS. WAGNER:** Only specially, Your Honor.

25    **THE COURT:** Specially appearing.

1    In terms of getting the resolution of the

2  jurisdictional questions and apparently some of these

3  additional parties that are out there, I know you've done

4  discovery when the case was in State Court.  Isn't it best if I

5  keep it on a short leash, to get that all resolved before

6  general discovery opens up?

7    **MR. CHATTERJEE:**  Your Honor, it probably is.  Our

8  big concern is, is from our perspective ConnectU and many of

9  the other defendants have done a very effective job in delaying

10  this case.  It was filed in August of 2007 -- or 2005, excuse

11  me.  So it's almost two years old as it is.  We've spent the

12  better part of eight months, I think, I haven't done the exact

13  math, just dealing with all these jurisdictional issues.

14    **THE COURT:**  Right.  Right.

15    **MR. CHATTERJEE:**  I have a suggestion to maybe try

16  and figure out some of these.

17    We talked about ADR in our submission really in the

18  context of ConnectU and Facebook and Mark Zuckerberg, but there

19  are a lot of other individual defendants here; and I

20  understand, you know, whatever points they want to make about

21  financial hardship or, you know, about what roles they play.

22    But I want to be clear about something.  At some

23  level we're pursuing this case against all these individuals

24  because they weren't cooperating with us.  They weren't telling

25  us or even evading service and not showing up for depositions

about things they did.  We have the documents, as Your Honor has seen, to show what they did.

We're willing to mediate with individuals and to see if there are ways to resolve the case by getting them out.  Because, I mean, at some level this is like a criminal prosecution.  You know, these people are people who did things that were probably wrong that we have serious issues with, but they're doing it at the direction of higher-level people and it's the higher-level people that we're really more focused on.

And, perhaps, one way to deal with some of the jurisdictional issues is to have mediations with some of the, you know, who we all consider the smaller players in this whole scheme and see if there are ways to get resolution.

**THE COURT:**  Well, I think those players are entitled to the threshold determination from me as to whether or not they're in this case or not.  I mean, I don't think that it's appropriate for me to send off to ADR somebody before they have gotten some read from me on -- you know, I've never sent somebody off nor am I aware of a circumstance where somebody is specially appearing and goes to ADR.  I mean, we have to decide whether they're in the case or not because that is just basic fairness.

**MR. CHATTERJEE:**  Fair enough.

**THE COURT:**  If they're in the case, then, and this goes back to the ADR point, you know, the parties are saying,

"Well, only" -- one side is saying, "Let's go to ADR with everything on the table.  Let's go to ADR only with the Northern District case on the table."

My reaction is, that indicates to me I want to get you in front of some ADR official and then you can hash it out in the ADR process, but it would behoove everybody to try to resolve everything at one time.

I mean, I don't quite get this idea that we'll only talk about "X."  I know this is more Mr. Mosko's position than yours, Mr. Chatterjee; but, you know, "The ADR is only going to be about this part of the case.  It's not going to be about the other."  I mean, I don't think that's a very productive way to look at it, and I wouldn't want to hamper the ADR process in advance.

Now it may be that there's some issues about the mediator's authority to require the attendance of certain people if they're not part of this case and that's a dicey issue, but this is what I want to do:

I want to get through these preliminary motions and find out once and for all who are the people in my case, and I want to do that quickly, as quickly as we can do it; and I think we're actually on the road to getting that resolved.  Because as I understand it, and now I will look in your direction --

**MS. WAGNER:**  Thank you, Your Honor.

**THE COURT:** -- there will be another wave of jurisdictional motions, these individuals who have been named; correct? And that's -- I know the names are here but I haven't committed them to memory. But I assume I'm going to be getting -- I slowed you down on that because I wanted to have this done, my order to go out. Because, you know, you don't want to just waste time making arguments I've already decided. So I need to get you an order fairly quickly, and then I would anticipate we'll have the next wave, and then we should have a pretty clear picture of who's in the case.

The upshot of this is, I'm inclined to move the CMC one more time with the notion that by the next CMC date we know who's here. And at that next CMC date, that will be the time when things start to get set; and in the meantime, I want the parties to renew their discussion on coordinated discovery between the Massachusetts case and the California case.

My expectation would be that we could be through the jurisdictional motions, and I know some of it's dependent on when I issue my order, but within the next 60 days. Any reason why that -- I mean, I know it's dependent on when you get my order.

**MR. CHATTERJEE:** Your Honor, I think that we would. One of the issues, I suppose it's not a major one, is there are two individuals that will likely -- depending on what your order says and what the defendants do -- that may move to

1 dismiss for personal jurisdiction one is Mr. Gucwa and the

2 other is Mr. Chang.

3       **THE COURT:** Yeah.

4       **MR. CHATTERJEE:** We haven't had a chance to take

5 their depositions to know if they're going to be putting in

6 declarations or anything.

7       **THE COURT:** So we're going to have another request

8 perhaps for jurisdictional discovery.

9       **MR. CHATTERJEE:** That may or may not occur depending

10 upon what happens.

11       Now one of the few areas where we were able to

12 pretty much work together was on the structuring of the

13 schedule for this motion that was heard today.

14       **THE COURT:** Right.

15       **MR. CHATTERJEE:** And my hope would be that, you

16 know, if they wanted to file a motion to dismiss and discovery

17 was necessary, that we could do the same thing and accomplish

18 all this within 60 days.

19       **THE COURT:** Okay.

20       **MR. CHATTERJEE:** But stranger things have happened

21 and this has been an acrimonious case, Your Honor.

22       **THE COURT:** Well, what's your -- Mr. Mosko, what do

23 you think about that?

24       **MR. MOSKO:** Well, if you get your order out in 20

25 days, Your Honor, which is --

1      **THE COURT:**  That's my hope.

2      **MR. MOSKO:**  Okay.  So that's 20 days.  And we would

3  need, you know, let's say another 20 days in order to get our

4  motions to dismiss on calendar.  So that's 40 days.

5      **THE COURT:**  Yeah.

6      **MR. MOSKO:**  And if we give you the usual notice,

7  which is 35 days' notice, then we're talking about 75 days if I

8  did my math correctly.

9      **THE COURT:**  Okay.  All right.

10      **MR. MOSKO:**  And if you are inclined to give

11  discovery -- if you're inclined to give them discovery, then,

12  you know, depending on the schedules of the parties, and the

13  like, you know, I suppose it's doable but, you know, it's going

14  to be awfully close.  And I don't know to coordinate our three

15  schedules, then coordinate depositions of all these other

16  folks, even if they are -- I think you previously ordered a

17  limited a four-hour deposition, so we could literally do them,

18  you know, at once.

19      **THE COURT:**  Well, what I will do is, you know, I'm

20  inclined to give you a CMC date -- which I'll go back and do

21  some calculating and we'll set it right now -- that

22  contemplates being done with all of this; and, as you say, I'm

23  not going saying it's going to be 60, but it's going to be the

24  notion anyway that we -- once we get the players identified,

25  that I want to then get a plan in place promptly because I

don't want it to just keep lingering on.  I want to get moving.

So that would be my expectation.  And, you know, if the CMC is

75 days instead of 60 days, okay, well, whatever.

With respect to the schedule that Facebook has

proposed, I mean, you've got a whole bunch of dates in here.

Some of these may not be inconsistent with what I've just said,

but I'm just not comfortable yet setting those dates, because I

think -- I know you've done a lot of discovery already, so this

is not starting from scratch.

**MS. WAGNER:**  Your Honor, if I could please be heard

on that particular issue.

**THE COURT:**  Yes.

**MS. WAGNER:**  Initially when we were exchanging

graphs at the CMC statement, there was a proposal to conclude

discovery by the end of September.

**THE COURT:**  Yeah.

**MS. WAGNER:**  And Mr. Chatterjee and his client

agreed -- clients agreed to push that out to the end of

November.

But the problem now, and the reason that my client

is concerned about this, is that assuming even that everything

moves along very quickly and we get a new CMC hearing set

within 75 to 90 days, if discovery is going to be ending any

time, any date with 2007 at the end of it, my client and I have

to imagine some of the other newly named defendants are going

1  to be at a severe disadvantage.

2  You know, everyone has talked about counsel who are

3  appearing, firms anyway, appearing on both sides of the country

4  and voluminous discovery and how should it be coordinated or

5  repeated or not.  I truly am in the dark.

6  **THE COURT:**  Well --

7  **MS. WAGNER:**  I'm not with Finnegan Henderson; and,

8  so, I think just to put a flag in the Court's mind when we

9  address these issues at the next CMC, it's just to allow us

10  enough time for discovery for the individuals including my

11  client.

12  **THE COURT:**  Let me set your mind at rest.  I do not

13  anticipate that at the next Case Management Conference I would

14  be setting dates that would be a month from now discovery is

15  closed --

16  **MS. WAGNER:**  Right.

17  **THE COURT:**  -- or something along those lines.

18  My message to you is that once the dust settles, at

19  the next Case Management Conference I'm not going to set this

20  on the slow boat and assume that it's, you know, going to

21  meander down the river there -- to use my nautical metaphor

22  here -- for a long time.

23  I mean, I'm going to -- you should assume that I

24  will expect the parties to actually move with some dispatch.

25  Because I think there's been a long period here, not

1  unprecedented.  You know, I mean, in a securities case, we'd

2  have the same kind of long ramp up.  But you have done a lot of

3  discovery before, or not you in particular, your client.  So I

4  will expect people to move quickly.

5          And on the ADR front I will expect that at that

6  point that probably in front of Judge Chen, or one of my other

7  colleagues, it will be -- it will occur quickly.  I mean,

8  depending on my colleague, colleague of choice's calendar, but

9  it will be within a short period of time.  So just be prepared

10  at the next Case Management Conference to be suggesting to me

11  dates that are somewhat aggressive, but I'm not going to put

12  you in an untenable position in terms of that.

13          Just remind me.  Your client -- what is your client?

14  Who is your client and what's --

15          MS. WAGNER:  My client is David Gucwa.  He resides

16  in the state of Washington also.

17          THE COURT:  Yes.  And what's his -- the basic fact

18  of who he is?

19          MS. WAGNER:  Mr. Gucwa -- I actually misspoke.  He

20  resides in Massachusetts.  He is -- correct me if I'm wrong

21  because I am very much new to this case -- was involved with

22  the PNS process.

23          THE COURT:  Okay.

24          MS. WAGNER:  And, so, that -- but he is -- has never

25  been named as a party to any of these litigations, has never

had his deposition taken as of yet; and, you know, we're a

completely separate law firm. You know, Dechert is obviously

not part of Finnegan Henderson.

THE COURT: Right.

MS. WAGNER: We're not under the protective order.

Even in this case, putting aside Massachusetts, even in the

California action --

THE COURT: All right.

MS. WAGNER: -- there is extensive litigation that's

gone on for quite some time that we haven't been privy to; and,

so, there will be some time that we would need to get ready

even for ADR with respect to our client. And we are more than

happy to do that with dispatch, not -- I do not mean to suggest

that we are going to be redoing a lot of more general

discovery; but in a situation like this, Facebook did choose to

name a single individual and he has now got something very much

on the line in this case. Assuming that if there were personal

jurisdiction, which I think there should not be based on what I

know, he will need some time to get his bearings and so will

his counsel.

THE COURT: Okay. What I'm going to do is, with the

order on the pending motions I'll issue a -- set a new date for

a Case Management Conference and then I may also ask you to

address some specific things. This may not be in the order

setting it, but issues like coordination with the Massachusetts

1  action and others.  I may actually ask for some more specific

2  information to be given to me in advance.  So I'll do that.

3      Anything else?  One last go-around.  You first,

4  Mr. Chatterjee.

5      **MR. CHATTERJEE:**  Mr. Mosko raised his head first, so

6  I'll cede the floor to him and then I'll come back.

7      **THE COURT:**  All right.  Mr. Mosko?

8      **MR. MOSKO:**  It's the first time we've come to

9  agreement today, Neel.

10     **THE COURT:**  Go ahead.

11     **MR. CHATTERJEE:**  He's my learned brother.

12     **THE COURT:**  Go ahead, Mr. Mosko.

13     **MR. MOSKO:**  Every time somebody refers to that in an

14  opinion you know they're going to disagree with you.

15     **THE COURT:**  Distinguished gentleman.  Yeah.  Go

16  ahead.

17     **MR. MOSKO:**  I think what you've set forth makes

18  sense, Your Honor.  The only thing I would ask for,

19  particularly until we get all these jurisdictional issues

20  resolved and who's in and who's out, let's not do discovery

21  other than what's directly related to the jurisdictional

22  issues.  Let's just get them done.  If we're going to get them

23  set within 30 or 60 days, or whatever, let's do that, but let's

24  not be --

25     **THE COURT:**  Well, discovery is going on in the

1  Massachusetts action; right?

2          **MR. MOSKO:**  Discovery is going on in the

3  Massachusetts action.

4          **THE COURT:**  So you're not suggesting that if a

5  question has some relevance to this case, it's -- I mean, okay.

6          **MR. MOSKO:**  I just don't want to have to be doing

7  discovery on nonjurisdictional issues.  We're going to get some

8  guidance from your order.  The issues are going to become ripe.

9  I don't want to have to go out and do a bunch of depositions

10  only to find out, you know, when they're not really to do with

11  jurisdiction.

12          **MR. CHATTERJEE:**  Therein lies the problem,

13  Your Honor.

14          **THE COURT:**  Okay.  I'm listening.

15          **MR. CHATTERJEE:**  I was in Massachusetts a couple

16  weeks ago.  I will be back there at the end of July arguing

17  motions to dismiss.  The first ConnectU case was dismissed.

18  It's now on appeal in the First Circuit, and they sued us again

19  and we're in the pleading stage there.

20          But contemporaneously, essentially, the District

21  Court over there said the discovery from the first case carries

22  over into the second one.  The Court's made it very clear

23  discovery is moving forward.  I flew out to Dallas on Friday to

24  meet and confer live with opposing counsel, lead counsel, at

25  Finnegan Henderson in that case.

1          **THE COURT:** Okay.

2          **MR. CHATTERJEE:** And I cc'd Mr. Mosko on an e-mail

3   before that saying, "We've imaged umpteen hard drives. We

4   extracted it with the following keywords. Let us know if you

5   have any other keywords you want us to pull out data on." And

6   we're reviewing a 142,000 records, each record can be many,

7   many pages. We don't know but we're reviewing each one.

8          And the point of all this is discovery is moving

9   forward there; and, as I said before, there are people where

10  discovery is going to overlap between the two.

11         I feel like I'm being a little bit whipsawed,

12  because on the one hand, you know, if I want to go depose iMarc

13  with issues that relate to Massachusetts, there's necessarily

14  overlap with California and vice versa here, and I don't want

15  to have to go back and revisit all that.

16         That case is going forward and we've got to prepare

17  a defense. Issuing a blanket stay here and then trying to

18  unpack what's here and what's there is extraordinarily

19  difficult.

20         **THE COURT:** Well, at the moment there's no blanket

21  stay I'm issuing because I don't have any kind of motion to

22  that effect. And, so, the only in-practice stay, if you will,

23  would be the timing involved in getting through the motion, the

24  jurisdictional motions.

25         But in the difficulty -- the reason that I hesitate

to allow discovery to start up is that these individuals need
to know if they're in or out of the case, whether or not they
participate in discovery or don't.

I know your argument is perhaps some of them are
represented by the same counsel in the line and the like, but
the fact of the matter is that, you know, they would be obliged
to be perhaps participants in a different way if they're
defendants than if they're not.

That is why I'm concerned about opening the door to
discovery until we know exactly who the players are.  Once we
know who the players are, barring some motion to stop it, I
would expect discovery to get going.

But I guess what I'm looking for from you is, do you
really think there is a basis to have discovery go forward now
until I've made the decision on who's in and who's out?

**MR. CHATTERJEE:**  I think so, Your Honor.  I mean,
this case has been going on for a long time.

**THE COURT:**  Yeah.

**MR. CHATTERJEE:**  Most of the things that we're
discovering really implicate ConnectU.  The other people were
participants in this, but in many instances they may not.  For
example, I'll go back to iMarc --

**THE COURT:**  Right.

**MR. CHATTERJEE:**  -- because that's a good example.
IMarc is someone who interacted with ConnectU.  They were fired

1    because they didn't want to do something that was unlawful.

2    That was when PNS was brought in.  At some level, you know,

3    that evidence implicates ConnectU a lot more than it would

4    implicate PNS, Gucwa, or the other defendants.

5            The reality is that many of those defendants are

6    going to have to be deposed in Massachusetts in fairly short

7    order because of the schedule there.  If it means that they're

8    going to get deposed twice because the California people need

9    it, that's going to happen anyway.  I would like to minimize

10   that if at all possible.

11           **THE COURT:**  Sure.  But, remember, these are people

12   you named in the case.  I mean, you know, that's why we have to

13   wrestle with the concept or the issue of whether or not they're

14   going to be here or not, so...  Okay.

15           **MS. WAGNER:**  Your Honor, if I could just chime in on

16   that again.  I think that's really the sticky wicket here,

17   which is for my client, Mr. Gucwa, and the other recently named

18   individuals, they're in a position where discovery in this case

19   basically sounds like it will be confined to jurisdictional

20   issues except to the extent, perhaps, it overlaps with

21   Massachusetts, a case that they're not involved in and aren't

22   under the protective order and have no basis of knowledge about

23   such that we could have an outlier like Mr. Gucwa having to do

24   depositions again, which would be highly inefficient for

25   everyone involved; or, you know, simply forego having any

1    involvement or representation with respect to those in the

2    event he stays in the case.

3            And I think that Your Honor's suggestion that the

4    parties should be working to try and coordinate discovery in

5    the two actions so there isn't duplication really weighs

6    against forging forward, at least presumably with some of the

7    discovery, in the Massachusetts case in the interim if it's

8    going to be used or the idea is to use it in California.

9            **THE COURT:**  When was that case filed?  I know you've

10   got two.  You said one is on appeal.  The second one -- when

11   was the second Massachusetts case filed?

12           **MR. CHATTERJEE:**  It was filed I think May 31st of

13   this year.

14           **MR. MOSKO:**  March 28th.

15           **MR. CHATTERJEE:**  March 28th, I'm sorry.

16           **THE COURT:**  March 28.

17           **MR. CHATTERJEE:**  Two months off.  March 28.

18           **THE COURT:**  2007.

19           **MR. CHATTERJEE:**  2007.

20           **MR. MOSKO:**  Motions to dismiss are going to be heard

21   at the end of this month.

22           **THE COURT:**  Okay.

23           **MR. CHATTERJEE:**  We also have to submit a joint

24   report on the status of discovery on July 29th, I believe.

25           **THE COURT:**  So that Court has set discovery even

1  before the motions to dismiss are resolved?

2        **MR. CHATTERJEE:**  Because it carried over from the

3  last -- just to give you some context, Judge.  In the previous

4  case there were a number of discovery issues outstanding.

5  There was a full day of oral argument and a number of motions

6  pending, and basically the Court said, "You know, meet and

7  confer live.  I want a joint report on what's still

8  outstanding.  Let's try to resolve as much of this stuff given

9  that I already had oral argument."

10        And, frankly, I think we've resolved most of the

11  issues.  There might be a few small things left, but I think

12  some of the logjams have been broken and at the end of July

13  we'll be submitting a report saying, "Here's what our plan is."

14        **THE COURT:**  Okay.

15        **MR. CHATTERJEE:**  But the Court was very clear

16  discovery is going forward.  We'll resolve the pleadings in the

17  interim to try to pare out some of the defendants and some of

18  the claims --

19        **THE COURT:**  Okay.

20        **MS. SUTTON:**  -- and see if we can focus the case.

21        **THE COURT:**  Okay.  But it's a somewhat unusual

22  circumstance because it's a follow-on case as opposed to a new

23  case.

24        **MR. CHATTERJEE:**  That's right.  The original case

25  was dismissed for lack of subject matter jurisdiction.

1 **THE COURT:** All right. Okay. I'm going to think

2 about this. So rather than issuing some new dates to you, I'm

3 going to do it in conjunction with also deciding on the pending

4 motion and try to move it along quickly. In any event, try to

5 get the order out to you with some dispatch.

6   And then I'll give you some new dates and I'll take

7 into account the request. Just to clarify you want discovery

8 to be up and running in this case now, Mr. Chatterjee, and you,

9 Mr. Mosko, think it should wait at the very least the

10 resolution of the jurisdictional motions.

11   **MR. MOSKO:** Yes, Your Honor.

12   **THE COURT:** And Ms. Wagner is with you on that

13 issue.

14   **MS. WAGNER:** Yes.

15   **THE COURT:** Okay.

16   **MR. CHATTERJEE:** And, Your Honor, I just want to be

17 clear. If both cases were stayed and it was going forward in a

18 coordinated approach where we're are trying to do everything at

19 once --

20   **THE COURT:** Right.

21   **MR. CHATTERJEE:** -- I would be perfectly fine doing

22 it that way.

23   **THE COURT:** Right.

24   **MR. CHATTERJEE:** The problem is, in Massachusetts I

25 have to deal with building a defense in that case.

1          **THE COURT:**  Right.

2          **MR. CHATTERJEE:**  And I can't be doing it at the last

3   minute.

4          **THE COURT:**  And I take it, again, as you point out,

5   perhaps Mr. Mosko is not counsel in the Massachusetts case; but

6   you're not in the position now to say, "Well, we'll put all

7   discovery on hold at this juncture to try to coordinate it with

8   the cases."

9          **MR. MOSKO:**  Well, I can't talk for the Massachusetts

10  case.  I do want to say, and I hope Mr. Chatterjee and I can

11  resolve this without the Court's involvement, but there is,

12  yesterday I think they noticed this deposition of iMarc; and,

13  so, perhaps at the very least until we get your order we can

14  hold off on doing that until we know what's going on, and

15  that's what I would hope Mr. Chatterjee and I can work out.

16         **MR. CHATTERJEE:**  I think we can work it out,

17  Your-Honor.

18         **THE COURT:**  Yeah.  See what you can do.  Okay.

19  Thank you.

20         **MR. MOSKO:**  Thank you, Your Honor.

21         **MS. SUTTON:**  Thank you, Your Honor.

22         **MR. CHATTERJEE:**  Thank you, Your Honor.

23              (Proceedings adjourned at 12:47 p.m.)

24

25

1

2

3

4 **CERTIFICATE OF REPORTER**

5

6          I certify that the foregoing is a true and correct

7 transcript, to the best of my ability, of the above pages of

8 the official electronic sound recording provided to me by the

9 U. S. District Court, Northern District of California, of the

10 proceedings taken on the date and time previously stated in the

11 above matter.

12          I further certify that I am neither counsel for,

13 related to, nor employed by any of the parties to the action in

14 which this hearing was taken; and, further, that I am not

15 financially nor otherwise interested in the outcome of the

16 action.

17

18 _Kelly Bryce_                    02/24/09

19          Signature of Transcriber     Date

20

21

22

23

24

25